# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

No. 19-2432

_____

**DANIEL LEWIS LEE**,
Appellant,

v.

**UNITED STATES**,
Appellee.

_____

On Appeal from the United States District Court
Eastern District of Arkansas
No. 4:18-CV-00649-JLH; 4:97-cr-00243-KGB-2

_____

## APPLICATION FOR CERTIFICATE OF APPEALABILITY
_____

MORRIS H. MOON
Bar# 24032750 (TX)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Bar # 420813 (CT)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Appellant Daniel Lewis Lee

Dated: September 6, 2019

# Table of Contents

I. Introduction and Summary of the Case……………………………………....1

II. Standards for Issuing a Certificate of Appealability………………………10

III. A COA should issue on whether the district court improperly denied Mr. Lee's *Brady* and *Napue/Giglio* claims……………………………………..11

    A. Reasonable jurists can disagree whether Mr. Lee's *Brady* claims are material…………………………………………………………………17

        1. The district court improperly assessed the *Brady* information in isolation rather than cumulatively……………………………19

            a. Viewed in light of the whole trial, the Wanker evidence is material……………………………………………...20

            b. Under Arkansas law, co-conspirator testimony cannot be relied on absent substantive corroboration…………….31

            c. The district court failed to consider the collateral effects of the Wanker information in its materiality analysis…33

        2. The district court failed to address a separate theory of materiality…………………………………………………….35

    B. Reasonable jurists can disagree whether a *Brady* claim based on material evidence requires preauthorization………………………...37

        1. The district courts in the Eastern District of Arkansas are split on this issue………………………………………………...38

        2. The district court's definition of "ripeness" in assessing whether a claim is "second or successive" is debatable……...39

Appellate Case: 19-2432    Page: 2    Date Filed: 09/06/2019 Entry ID: 4827942

IV.    A COA should issue on whether the district court improperly denied Mr. Lee's Rule 60(b)(3) motion……………………………………………………...43

        A.    Reasonable jurists can disagree whether the district court lacked authority to extend the deadline…………………………………….46

            1.    The one-year limit under Rule 60(b)(3) is non-jurisdictional, so it can be equitably tolled…………………………………...46

            2.    The district court's failure to address the equitable tolling issue requires a remand…………………………………………..50

        B.    Reasonable jurists can disagree whether there was fraud, misrepresentation or misconduct by the opposing party under Rule 60(b)(3)…………………………………………………………...51

            1.    Mr. Lee alleged that the Government's failure to produce *Brady* information was the result of a pattern of misconduct……….52

            2.    Reasonable jurists can disagree whether the Government's misconduct prevented Mr. Lee form fully and fairly litigating his initial § 2255 motion…………………………………...53

V.    A COA should issue on whether the district court improperly denied Mr. Lee's Rule 60(d)(3) motion……………………………………………...56

Conclusion……………………………………………………………………...60

Certificate of Service…………………………………………………………...61

ii

Appellant, Daniel Lewis Lee, hereby moves before the United States Court of Appeals for the Eighth Circuit, by and through his undersigned attorneys, for the issuance of a Certificate of Appealability ("COA") pursuant to 28 U.S.C. § 2253(C)(1)(B). A COA is sought to allow appellate review of the decision of the United States District Court for the Eastern District of Arkansas, Hon. J. Leon Holmes, U.S.D.J., denying all relief and a COA.

As explained in this application, the district court did not resolve all the issues below so, as a preliminary matter, Mr. Lee respectfully requests that this Court summarily grant COA and remand with instructions to decide those issues.

## I. Introduction and Summary of the Case

In 1999, Daniel Lewis Lee and co-defendant Chevie Kehoe ("Mr. Kehoe")[1] were jointly tried and convicted by a jury of participating in a pattern of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act, commonly referred to as RICO. The Government alleged that Mr. Kehoe was the leader of the racketeering enterprise and that he directed Mr. Lee to participate in various crimes in furtherance of the enterprise. Although the jury rendered acquittals on numerous alleged racketeering acts – including a bombing of the

---

[1] Throughout this motion, "Mr. Kehoe" refers to Chevie Kehoe. To avoid confusion, the movant will refer to other members of the Kehoe family (primarily, Kirby, Gloria and Cheyne Kehoe) by either their full names or their first names only.

Spokane City Hall in 1996, the 1995 murder of Jeremy Scott in Idaho, and the 1996 murder of John Cox in Idaho – it convicted them of the 1996 robbery and murders of William Mueller, Nancy Mueller, and Sarah Powell in Tilly, Arkansas ("the Mueller murders"). In separate penalty phase hearings, the jury sentenced Mr. Kehoe to life without possibility of release and sentenced Mr. Lee to death for each of the three murders. The Government has scheduled Mr. Lee's execution for December 9, 2019.

*The Trial Evidence*

The greater part of the guilt phase case dealt with Chevie Kehoe's history and his purported racketeering enterprise, the "Aryan People's Republic."[2] The guilt phase evidence against Danny Lee was built primarily on the testimony of two cooperating witnesses: Gloria Kehoe (Chevie's mother) and Cheyne Kehoe (Chevie's brother). They each testified that Mr. Kehoe confessed his and Mr. Lee's involvement in the Mueller murders, and Gloria claimed that Mr. Lee had also separately confessed to her.[3] The Government, however, could not rely solely on this testimonial evidence to obtain a conviction against Mr. Lee. As is explained in

---

[2] The Government alleged the enterprise was also called the Aryan People's Resistance, or the Aryan People's Revolution, or the Aryan Republic Resistance, or the American People's Republic. Tr. 4129, 5551, 5568, 7019.

[3] Gloria and Cheyne were also implicated in the alleged racketeering enterprise but were provided immunity in exchange for their testimony.

2

more detail below, Gloria and Cheyne had significant credibility problems: They each had substantial motives to curry favor with the Government given their own criminal activities, they had given multiple inconsistent statements to law enforcement, and crucial aspects of their respective stories were contradicted by other witnesses and even by physical evidence. (Indeed, the jury issued acquittals on numerous other racketeering acts – including a bombing and other murders – the evidence of which rested solely on the testimony of Gloria and Cheyne.)

The Government presented two pieces of evidence that independently corroborated Mr. Lee's involvement in the Mueller murders: (1) expert evidence that a hair found in a hat worn by one of the perpetrators was microscopically similar to Mr. Lee's hair, and (2) testimony from a disinterested witness, James Wanker, that Danny Lee had once bragged to him that he had been involved in a crime that appeared to resemble the Mueller murders. Tr. 4082.[4] The Government told the jury at the time that it should credit Mr. Wanker's testimony about Mr. Lee's confession because he was an unbiased witness who had no incentive to come forward other than to tell the truth. Tr. 7002.

---

[4] Citations to the consecutively-paginated trial transcript are designated as "Tr." Citations to documents filed in the district court criminal docket in this case are designated as "Doc. No." Citations to the attached appendix are designated as "APP."

Appellate Case: 19-2432    Page: 6    Date Filed: 09/06/2019 Entry ID: 4827942

In the years since Mr. Lee's trial, one of those two pieces of evidence has already been eliminated: DNA testing has conclusively established that the "matching hair" was not, in fact, Mr. Lee's. *See* APP at A9 (Serological Research Institute Mitochondrial DNA Report).[5]

### *The Recently Uncovered* Brady *Material*

More recently, Mr. Lee discovered that the Government suppressed evidence that would have caused the jury to discount the second piece of evidence, Mr. Wanker's trial testimony. As detailed in his sworn declaration, *see* APP at A1-A3 (Declaration of James Wanker, hereafter "Wanker Dec."), James Wanker repeatedly told the Government prior to trial that he did not believe that Danny Lee's statement implicating himself in the Mueller murders was true. Rather, Mr. Wanker warned authorities that Mr. Lee had a habit of falsely claiming responsibility for criminal acts in order to make himself seem like a "tough guy," and that the boast about an unspecified murder was delivered in the same "empty bragging" manner the witness had seen before. Upon recently being shown copies of the written reports of his pre-trial interviews, Mr. Wanker was surprised to see that none of them included his warnings and that they omitted any such information.

---

[5] DNA testing was conducted on the hair in 2007 in connection with his initial § 2255 proceeding.

Appellate Case: 19-2432    Page: 7    Date Filed: 09/06/2019 Entry ID: 4827942

Mr. Wanker further attested that prior to testifying at Mr. Lee's trial, the Government instructed him not to volunteer any information while on the witness stand, and only to answer the specific questions asked of him. He therefore did not relate to the jury that Danny Lee had a penchant for boasting about acts he had not committed; that he had consistently warned authorities about that fact; and that despite appearing as a witness for the Government in a trial on that very charge, he continued to doubt the veracity of Mr. Lee's purported admission. Moreover, Mr. Wanker declared that the Government had shaped his written grand jury testimony to omit information that was inconsistent with its theory of the case, and would have further demonstrated that the underlying statement by Mr. Lee was not trustworthy.

*The Proceedings Below*

Based on the information contained in Mr. Wanker's declaration, Mr. Lee filed a second-in-time § 2255 motion alleging that his conviction was obtained in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny because the Government suppressed favorable and material impeachment evidence. Mr. Lee also alleged that his conviction was obtained in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972), because the Government introduced misleading, inaccurate and prejudicial testimony at his capital trial. Mr. Lee argued that under extant circuit law, second-in-time *Brady*

5

Appellate Case: 19-2432    Page: 8    Date Filed: 09/06/2019 Entry ID: 4827942

claims are not subject to preauthorization by the circuit court, and therefore the district court could consider the § 2255 motion in the first instance.

Mr. Lee asked in the alternative that if his § 2255 motion was deemed to be successive, the court should consider his claims concerning the suppression of the Wanker motion pursuant to Rule 60 of the Federal Rules of Civil Procedure. He argued that because the Government continued to conceal the Wanker information during the prior § 2255 proceeding, Mr. Lee was prevented from fully and fairly litigating his original § 2255 *Brady* claim, as well as his post-conviction discovery request for *Brady* information. Thus, the Government's misconduct in concealing this information constituted "fraud…, misrepresentation, or misconduct" in violation of Rule 60(b)(3), or "fraud on the court" under Rule 60(d)(3), that warranted reopening the prior § 2255 judgment.

The district court denied Mr. Lee's § 2255 motion, as well as his motions under Rule 60. It held that his *Brady* and *Napue*/*Giglio* claims were not material. It further held that even if the *Brady* claims had been material, extant law requires preauthorization before a second-in-time § 2255 motion can be considered by the district court.

The district court rejected Mr. Lee's Rule 60(b)(3) motion, finding that it was both untimely and that Mr. Lee failed to allege facts proving the Government committed misconduct by intentionally withholding evidence. It denied the Rule

6

60(d)(3) motion on the ground that the Government's misconduct did not rise to the level of "fraud on the court."

*The Need for a Remand*

In this Application for a Certificate of Appealability (COA), Mr. Lee will explain why the district court's resolution of these claims is, under the applicable COA standards, "debatable by jurists of reason" and therefore deserving of appellate review by this Court. But before delving into these matters, this Court must be alerted to a threshold issue that necessitates an immediate remand: the district court failed to resolve all the issues below.

Specifically, the district court failed to rule upon the following:

1. Mr. Lee raised two different theories of favorability and materiality concerning his *Brady* claims. Had the defense been privy to the suppressed information, they would have discredited *or moved to exclude* Mr. Wanker's testimony. The first theory, which was ruled upon by the court, concerned the manner in which the *Brady* information could have been used to cross-examine Mr. Wanker and impeach the alleged confession in the presence of the jury. The second theory, however, concerned the *exclusion* of Mr. Wanker's testimony about the alleged confession altogether on evidentiary grounds. This version of the claim required an entirely different prejudice analysis, one in which the strength of the Government's case had to be assessed in the *absence* of the "confession," rather

7

than on the basis of what relative weight the jury might have given it. The district court did not rule on this issue. As with the equitable tolling issue, Mr. Lee used his Rule 59 motion to alert the court that it had failed to address this issue. But once again, the court did not mention it.

2. In response to the Government's assertion that the Rule 60(b)(3) motion was untimely, Mr. Lee argued that the court had the authority to equitably toll the filing deadline because the time limit was not jurisdictional. The district court did not address this issue in its order. Mr. Lee subsequently filed a Rule 59 motion and brought the issue to the attention of the court once again. In its order denying the Motion to Reconsider, the court this time acknowledged that the equitable tolling issue had been raised, but inexplicably failed to issue a ruling yet again.

Where an issue has been raised below, but not ruled on, proper judicial administration generally favors remand for the district court to examine the issue initially. *See, e.g., Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.") As this Court has stated:

> The rationale for the rule is twofold. First, the record on appeal generally would not contain the findings necessary to an evaluation of the validity of an appellant's arguments. Second, there is an inherent injustice in allowing an appellant to raise an issue for the first time on appeal. A litigant should not be surprised on appeal by a final decision there of issues upon which they had no opportunity to introduce

8

evidence. A contrary rule could encourage a party to "sandbag" at the district court level, only then to play his "ace in the hole" before the appellate court.

*Stafford v. Ford Motor Co.*, 790 F.2d 702, 706 (8th Cir.1986) (citations omitted).[6]

A remand to address unresolved issues is especially warranted in the context of a COA request because a circuit court otherwise lacks jurisdiction to consider whether to grant or deny a COA regarding an issue that was not considered first by the district court. *See Whitehead v. Johnson*, 157 F.3d 384, 387-88 (5th Cir. 1998). Thus, when confronted with a request for a COA on an issue that was never addressed by the district court, the routine practice among circuit courts is to summarily grant a COA and remand for further proceedings. *See*, *e.g.*, *United States v. Luera*, 212 F.3d 594 (5th Cir. 2000) (*per curiam*); *Smith v. United States*, 2018 WL 6039898, *2 (6th Cir. 2018); *Astorga v. Terhune*, 37 Fed.Appx. 284 (9th Cir. 2002) (summarily granting COA and remanding where district court failed to address equitable tolling issue); *United States v. Espinoza*, 421 Fed.Appx. 817 (10th Cir. 2010) (summarily granting COA and remanding where district court failed to address *Brady* issue); *Rhode v. United States*, 583 F.3d 1289 (11th Cir. 2009).

---

[6] Here, of course, Mr. Lee did the opposite of "sandbagging"—he flagged the issues that had been unresolved in his Rule 59 motion, but to no avail.

Appellate Case: 19-2432    Page: 12    Date Filed: 09/06/2019 Entry ID: 4827942

## II.     Standards for Issuing of a Certificate of Appealability

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires, as a pre-condition to appellate review of the denial of a motion brought pursuant to 28 U.S.C. § 2255, that a COA issue upon a showing that the applicant has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(C)(2). The Supreme Court has determined that this standard is a low bar. Proof of ultimate success is not required and the grant of a COA is especially favored in a capital case.

The leading cases on this issue are *Miller-El v. Cockrell*, 537 U.S. 322 (2003) and *Slack v. McDaniel*, 529 U.S. 473 (2000). A review of these cases reveals that the Supreme Court has simply adapted to the AEDPA the standards that were formerly applied to the issuance of a certificate of probable cause in pre-AEDPA habeas litigation, particularly as that standard was enunciated in *Barefoot v. Estelle*, 463 U.S. 880 (1983). In elaborating on the "substantial showing" language of the statute, *Miller-El* explained that the standard is met if "jurists of reason could disagree with the district court's resolution" of the claim or that "the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. The determination of whether the standard is met is a "threshold inquiry" that "does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Id.* at 336.

10

Appellate Case: 19-2432     Page: 13     Date Filed: 09/06/2019 Entry ID: 4827942

In *Slack*, the Court noted than an applicant met the standard if it was "debatable" whether the district court's assessment of the constitutional claim was correct. *Slack*, 529 U.S. at 484.

The Supreme Court has also been clear that a COA application does not have to show "entitlement to relief." *Miller-El*, 537 U.S. at 337. "The holding in *Slack* would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail." *Id.* A COA should issue even if it is unclear that relief will ultimately be obtained. *Id.* at 337-38 (holding that the COA standard "does not require a showing that the appeal will succeed," but merely "something more than the absence of frivolity or the existence of mere good faith on his or her part.").

The fact that this is a death penalty case further counsels in favor of granting a COA. In *Barefoot*, the Court emphasized that "in a capital case, the nature of the penalty is a proper consideration" in determining whether to certify and issue for appeal. *Barefoot*, 463 U.S. at 893.

## III.   A COA should issue on whether the district court improperly denied Mr. Lee's *Brady* and *Napue/Giglio* claims.

Mr. Lee's *Brady* and *Napue*/*Giglio* claims concern an alleged confession that Mr. Lee made to a Government witness, James Wanker. Mr. Wanker was a resident of the Shadows Motel in Spokane where Mr. Lee and the Kehoes occasionally stayed. Mr. Wanker testified that in July or August of 1996, a group

11

of people were having beers in the parking lot at the Shadows Motel when Mr.

Lee, unprompted, told Mr. Wanker that "somebody had fucked with him and so he

wrapped them up, taped them, and through (sic) them in the swamp." Tr. 4082.[7]

The testimony was offered at the capital murder trial as straight fact, with the

Government asking no questions about Mr. Lee's demeanor when the statement

was made or whether he appeared credible. The Government emphasized in its

argument to the jury that Mr. Wanker was an unbiased witness who was receiving

nothing in exchange for his testimony, and that his only incentive for coming

forward was to tell the truth:

> Nobody has paid Mr. Wanker anything. There is no reason for him to come in here and tell you that story unless it's the truth. And it's the truth because Danny Lee told him that. And there he told what happened. It's not detailed and it's not involved, but it's real and that's what they did.

---

[7] The Government also introduced testimony from Dalvine Wanker, James Wanker's then-wife, that sometime in August of 1996, she told Danny Lee that she was concerned about a new tenant at the Shadows Motel, and that in response Mr. Lee "went into [his] trailer and came out and he had a firearm and said that he wasn't afraid to use it and that when he had gone down south and that some people had fucked with him, and that he had taken care of it." Tr. 4093. At trial, the Government conceded her testimony was of limited probative value. *See* Tr. 7003 ("[I]t isn't a detailed statement"). Tr. 7003. Her statement provided no connection to the Muellers or even to Arkansas, nor were the murders committed with a gun. The Government needed James Wanker's testimony to corroborate the Kehoes' evidence.

Appellate Case: 19-2432    Page: 15    Date Filed: 09/06/2019 Entry ID: 4827942

Tr. 7002.[8]

The jury was given the impression that Mr. Wanker decided to alert authorities because he believed he had important evidence about Mr. Lee's guilt. This was not true. The previously undisclosed evidence establishes that the Government's presentation of Mr. Wanker's testimony was carefully choreographed to omit the facts and circumstances that would have led jurors to question the veracity of Mr. Lee's purported admission. As detailed in Mr. Wanker's sworn declaration (APP at A1-A3), if a complete account of what he had told authorities had been disclosed at the time of trial, it would have revealed instead that he had a well-founded basis to believe the statement Mr. Lee made to him was not true.

James Wanker met Mr. Lee in 1996 at the Shadows Motel in Spokane. Tr. 4078-79; Wanker Dec. at ¶ 4. Mr. Wanker lived in the motel, and Chevie Kehoe and his family lived in a trailer in the RV section of the property. Tr. 4079. Danny Lee would often sleep on a couch outside the Kehoe trailer. Tr. 4080-81. Mr. Wanker recalled that he "really seemed like he was just looking for somewhere to belong. He wanted to look badass like the Kehoes but you could tell he didn't really fit in with them." Wanker Dec. at ¶ 5. Over time, Mr. Wanker saw that Mr.

_____

[8] *See also id.* (arguing that people like Mr. Wanker were "salt of the earth," and that he was "not only a hard working guy; he's a mannerly guy").

13

Lee routinely made up stories to make himself seem tough and fit in better with those around him, including the Kehoes:

> Danny was a follower who tried to sound like a big guy. He was always trying to blow smoke up my ass; trying to impress me by sounding tough. He would spout off about different fights and crazy situations that were not true just to look tough and try to fit in.

Wanker Dec. at ¶ 6.

One summer afternoon in 1996, after Mr. Lee had been drinking beers, he started bragging again about how tough he was and about all the things he had done, including that he had once killed somebody in the south. Tr. 4082. These assertions were consistent with the empty bragging that Mr. Wanker had seen him exhibit in the past:

> When Danny made these comments about this trip, I didn't believe him. I knew him to be a braggart and that he would try to claim responsibility for criminal actions in order to fit in with the Kehoes. It still cracks me up that Danny was trying to be a tough guy.

Wanker Dec. at ¶ 7.

Almost a year later, in the spring of 1997, a local Spokane officer came to the Shadows Motel asking questions about the Kehoes. Wanker Dec. at ¶ 8. At the time, Chevie and Cheyne Kehoe were wanted for a shoot-out with police officers in Wilmington, Ohio; they had fled the shooting and their whereabouts were unknown. While chatting with the officer, Mr. Wanker mentioned that he had heard Mr. Lee brag about committing various crimes, including an unspecified

14

Appellate Case: 19-2432    Page: 17    Date Filed: 09/06/2019 Entry ID: 4827942

murder, but made clear that he did not believe any of it to be true. *Id.* Mr. Wanker told the same thing to ATF agent Michael Sprenger who also appeared to discount the story. *Id.*

On June 16, 1997, Cheyne turned himself in for the Ohio shooting. In exchange for leniency, he gave a statement to authorities implicating Mr. Lee and Mr. Kehoe in the Mueller murders. It was after Cheyne's statement that authorities showed a renewed interest in Mr. Wanker. *Id.* at ¶ 9. An officer from Arkansas contacted Mr. Wanker by phone on June 26 and asked him about what he had heard Mr. Lee say. *Id.* Mr. Wanker told him what he had told the Spokane officer, noting again that Mr. Lee did not appear to be credible. *Id.* About a week later, an ATF agent from the Spokane field office interviewed Mr. Wanker. *Id.* at ¶ 10. Once again, Mr. Wanker stated what he had heard and how it was of a piece with Mr. Lee's prior phony boasts. *Id.* Notably, the ATF agent also appeared to be dismissive of the story. *Id.* However, when the agents memorialized their interviews, they did not include any of the context or warnings Mr. Wanker had given them. *See* Doc. No. 1297 at 32.

In subsequent interviews with the Government prior to trial, Mr. Wanker repeated his observations and caveats to the case agent and the prosecutors: Mr. Lee had a history of claiming "credit" for misdeeds that were not his. Wanker Dec.

15

Appellate Case: 19-2432     Page: 18     Date Filed: 09/06/2019 Entry ID: 4827942

at ¶ 11. Yet these warnings, which undercut the very substance of the alleged statements, were consistently excluded from investigative reports.

The Government's misconduct continued throughout the judicial proceedings. The Government shaped Mr. Wanker's prepared written statement to the grand jury, leaving out information he had told them that was inconsistent with the Government's theory of the case. *Id*. at ¶ 12.

In preparation for his trial testimony, Mr. Wanker was told that what Mr. Lee had said was "very important" and that Mr. Wanker should stick to just answering the questions posed to him about it and not volunteer any other details, including why he believed Mr. Lee's "confession" was not credible. *Id.* at ¶ 12.

At every stage of the investigation, preliminary proceedings, and trial the Government sanitized Mr. Wanker's statements and shaped his testimony, enabling it to present the evidence in a false and misleading manner. Contrary to the specific impression the prosecution created at trial, Mr. Wanker was not a concerned citizen who initiated contact with authorities because he believed he had valuable, credible information to share about the Mueller murders. Instead, Mr. Wanker had well-founded doubts about the veracity of what he had heard. The jury never learned this because the Government worked to present him as a persuasive and compelling witness who could corroborate Cheyne's and Gloria's claim that Mr. Lee was involved in the Mueller murders. The jurors never heard that in reality Mr.

16

Wanker had repeatedly warned authorities from the start that Danny Lee's statement fit a pattern of "empty bragging" by a young man desperate to seem tough and fit in, and that Mr. Wanker found it no more credible at the time of his capital murder trial than he did when it was made. *Id*. at ¶ 13.

This evidence would have resonated with the jury. There was already testimony before the jury from a different Government witness that she also, like Mr. Wanker, heard Mr. Lee brag about committing violent acts and found it to be nothing more than mere braggadocio. Tr. 7640. Had the Wanker evidence been disclosed, trial counsel could have also alerted the jury to the fact that such boasting had been a consistent pattern in Mr. Lee's life even back to his teenage years. *See* APP at A16 (Canadian County Juvenile Court Report) ("He is diliberately (sic) sabotaging his treatment by claiming to have participated in very violent activities during leaves. This (sic) far these 'confessions' have been proven to be bogus…").

The district court did not dispute that the Government had suppressed this information, or that it was favorable to defense. Rather, it denied the claims on the basis that the information was not material under *Brady*. Doc. No. 1313 at 13-14.

### A. Reasonable jurists can disagree whether Mr. Lee's *Brady* claims are material.

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the

17

evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A showing of materiality "does not require demonstration by a preponderance that the disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id*. (quotations omitted). In addition, "it is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id*. at 435.

The district court ruled that Mr. Lee failed to establish the undisclosed Wanker information was material because "the jury heard related evidence." Doc. No. 1313 at 13. Since Mr. Wanker had told the jury that, at the time he heard the statement, he believed Mr. Lee was "talking to hear himself talk," the Court held that the new evidence "does not materially change his testimony…. Evidence of Wanker's continued opinion is not enough to overcome the overwhelming

18

evidence of Lee's guilt." *Id.* By isolating the Wanker statement and subsequently deciding that its falsity alone was insufficient to demonstrate prejudice, the district court's analysis was fundamentally flawed, or was at least debatable by jurists of reason.

### 1. The district court improperly assessed the *Brady* information in isolation rather than cumulatively.

The Supreme Court's decisions applying the *Brady* standard have explained that a materiality analysis is cumulative in nature, i.e. the whole trial must be examined in light of the new evidence. It is error to simply determine whether the piece of suppressed evidence, standing alone, would have resulted in a different verdict.

In *Kyles v. Whitley*, 514 U.S. 419 (1995), for example, the Court repeatedly emphasized that both the IAC-prejudice and *Brady*-materiality analyses were cumulative. *Id.* at 436 (after noting the similarities between IAC prejudice and *Brady* materiality, explaining that, "[for materiality purposes], suppressed evidence [must be] be considered collectively, not item by item"); *id.* at 436 n.10 ("We evaluate [the] cumulative effect [of undisclosed evidence] for purposes of materiality separately and at the end of the discussion . . . ."); *id.* at 441 ("The result . . . is incompatible with a series of independent materiality evaluations, rather than the cumulative evaluation required by [precedent]."). Most recently in *Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016), the Supreme Court again rejected a

19

Appellate Case: 19-2432    Page: 22    Date Filed: 09/06/2019 Entry ID: 4827942

prejudice determination that focused solely on the effect of evidence in isolation ("[T]he state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively….").

Following *Kyles,* the Eighth Circuit has also insisted on a holistic prejudice analysis. *See, e.g., Amrine v. Bowersox*, 128 F.3d 1222, 1230 (8th Cir. 1997) ("When determining the impact of evidence unavailable at trial, a court must make its final decision based on the likely cumulative effect of the new evidence had it been presented at trial."); *Battle v. Delo*, 64 F.3d 347, n.11 (8th Cir. 1995) (same).

### a. Viewed in light of the whole trial, the Wanker evidence is material.

The relevant prejudice inquiry is not whether Mr. Wanker's declaration is "enough to overcome the overwhelming evidence of Lee's guilt." Rather, the question is what the *whole* trial would have looked like to the jury absent constitutional violations. To resolve this question, the district court was required to engage with the remaining evidence in Mr. Lee's case in light of Mr. Wanker's statement rather than analyzing the effect of the suppressed evidence alone. In addition, absent a hearing, the court was required to accept Mr. Lee's allegations as true because they are not contradicted by the record or inherently incredible. *See Tinajero-Ortiz v. United States*, 635 F.3d 1100, 1105 (8th Cir. 2011). This is particularly true here, where the Government has never contested the veracity of Mr. Wanker's undisclosed information.

20

First, it must be noted that an unsupported assertion has followed this case like a mantra since initial appellate review: that the evidence against Daniel Lee was "overwhelming." *See*, *e.g.*, Doc. No. 1163 at 22, 31, 49; Doc. No. 1313 at 13. Close scrutiny of the record shows this conclusory description of the evidence to be false.

The case against Danny Lee relied almost exclusively on the testimony of two witnesses, Cheyne and Gloria Kehoe, who were themselves implicated in the alleged racketeering enterprise. (Cheyne claimed that he learned of Mr. Lee's involvement in the Mueller murders when his brother Chevie Kehoe confessed to him; Gloria, Chevie's mother, claimed that Mr. Lee confessed his involvement directly to her.) Both these witnesses were highly motivated to cut a deal with the Government and stay in its good graces.

Cheyne had just been sentenced to 24 years' imprisonment for his attempted murder of two Ohio police officers in a brazen daylight shoot-out that made national news. He was transported from his cell in Ohio to testify and in exchange for his testimony, his Ohio sentence was cut by more than half. But that wasn't the only benefit he got. As a member of his brother's alleged racketeering enterprise, Cheyne was exposed to federal charges that carried a potential life sentence. As part of his cooperation agreement, he received a grant of immunity and escaped

21

Appellate Case: 19-2432     Page: 24     Date Filed: 09/06/2019 Entry ID: 4827942

liability for *any* of the charged activities of the alleged enterprise.[9] *See* Doc. No, 1297 at 39-40.

Gloria was also looking to escape jail time. She faced both pending and threatened charges for various financial crimes that exposed her to 30 years in prison. In exchange for her cooperation against Mr. Lee, not only were those charges dismissed, but she also received immunity for her participation in the racketeering counts in this case. But that's not all. Gloria received substantial cash payments during the course of her cooperation – $2,250 per month, totaling roughly $27,000 by the time of her testimony: a useful income for a mother of six dependent children whose husband was in prison. *See* Doc. No. 1297 at 40.

That Gloria's and Cheyne's credibility was dubious was understood by the jury: it acquitted Mr. Lee and Chevie Kehoe of any racketeering acts predicated entirely on the testimony of Gloria and Cheyne, including:

- Racketeering Act 3, which alleged that Mr. Kehoe committed the murder of Jeremy Scott;

- Racketeering Act 7, which alleged that Mr. Lee and Mr. Kehoe set off a bomb at the Spokane City Hall;

- Racketeering Act 8, which alleged that Mr. Kehoe committed the murder of Jon Cox.

---

[9] Not long after he was released from Ohio, Cheyne was arrested again in 2013, along with his father, Kirby Kehoe, on federal firearms and drug charges. He pled guilty in 2014 to one count of being a felon in possession of a firearm and was sentenced to 41 months' imprisonment. He got out in September 2016. Kirby Kehoe is currently in prison.

Appellate Case: 19-2432     Page: 25     Date Filed: 09/06/2019 Entry ID: 4827942

The jury's acquittals on these very serious charged crimes demonstrate its reluctance to convict based solely on the word of Gloria and Cheyne Kehoe.

What made the Kehoes' testimony about the Mueller murders more reliable was that it was seemingly corroborated by forensic evidence and an unrelated witness. The jury was told that a hair found in a cap worn by one of the perpetrators matched Mr. Lee's hair, and that Mr. Wanker, an independent witness with no motive to lie, had come forward with evidence of a confession. Had the jurors known that both pieces of corroborating evidence were false, they might have looked far more skeptically at other aspects of the Government's case, just as they did on the counts on which they issued acquittals. Indeed, now that this crucial "independent corroboration" has been debunked, one cannot be assured that the trial resulted in a verdict worthy of confidence. As the following cumulative review of the case demonstrates, the "trial evidence resembles a house of cards, built on the jury crediting [the Kehoes'] account." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (*per curiam*).

In the Kehoes' version of how the crime happened, the murders had to have been committed in Tilly, Arkansas, late in the evening of January 11, 1996. *See* Doc. No. 1297 at 42. That was the only plausible time Mr. Lee could have been in Arkansas given other evidence. Yet Mr. Lee was seen halfway across the country

Appellate Case: 19-2432    Page: 26    Date Filed: 09/06/2019 Entry ID: 4827942

in Spokane, Washington, at 8 p.m. local time on January 13. *Id*. As the local paper

covering the trial aptly observed:

> The time frame that prosecutors said the Mueller murders occurred in does not neatly allow Chevie Kehoe and Lee enough time to get back to Spokane before witnesses placed them there. To do what prosecutors said they did, the pair would have had to drive 2,000 miles non-stop through the high altitudes of the West in the dead of winter.[10]

According to a Government trial witness, it would take between 35 to 43

hours to drive non-stop from Russellville to Spokane, depending on the route

taken. Tr. 6449-52. Although that was technically possible, accepting that timeline

required the jurors to indulge in a series of questionable assumptions: (1) that there

were perfect road conditions, even though evidence established it was icy and

snowy, which would have made it difficult to drive at full speed; (2) that Mr. Lee

was a capable driver, even though evidence established he had lost an eye only a

few months prior that damaged his depth perception and impaired his driving; and

(3) that this 2,000 mile trip could be made non-stop and without having to

regularly re-fuel. *See* Doc. No. 1297 at 46-47.

---

[10] *See* APP at A10, "But Here's A Dissenting Opinion," The Courier News (Russellville, AR), May 6, 1999.

Appellate Case: 19-2432    Page: 27    Date Filed: 09/06/2019    Entry ID: 4827942

Moreover, the timeline had to account for what the prosecution maintained was activity at three different crime scenes:[11]

(1) The Muellers' home in Tilly, where the perpetrators abducted, interrogated, and murdered the Muellers in their home; cleaned the home so thoroughly that they left no fingerprints and removed even trace amounts of blood that had soaked into the carpet; and loaded the victims' bodies and the cache of stolen property into the Muellers' Jeep and attached trailer;

(2) The area off Highway 7, over an hour drive from the Mueller home, where the Jeep was abandoned and the property and bodies of the family were transferred into the GMC truck; and

(3) The Illinois Bayou bridge near Lake Dardanelle, another 20 miles from where the Jeep was abandoned, where the victims were fastened to large, heavy rocks and dropped into the water.

In other words, several hours had to have elapsed to account for all of the activity that occurred between when the crime began and when the drive to Spokane actually commenced. That would have made the window of time to get from Tilly to Spokane much shorter.

This was clearly a concern for the jury: During the second day of deliberations, it sent out a note indicating it had questions about whether the requisite cross-country drive was possible in such a narrow time frame.[12]

---

[11] *See* APP at A11 (GPS coordinated of Mueller crime scene locations); APP at A12 (FBI 302 report re: driving times between crime scene locations).

[12] Tr. 7100 ("We want to know if there was any road problems—snow—on trip back to Washington from Tilly, Arkansas, on January 10, 11, 12, 13[.] [S]igned Juror 100."). The Court instructed the jury that it had to decide the issues

25

Appellate Case: 19-2432     Page: 28     Date Filed: 09/06/2019 Entry ID: 4827942

In fact, one of the Government's own witnesses appears to have placed Mr. Lee in Spokane on January 12, which would have made it impossible to have committed the crimes on January 11. *See* Doc. No. 1297 at 45; Doc. No. 1312 at 15-16.

Further complicating the timeline, numerous friends and acquaintances of the Muellers testified that they had seen one or more of them alive at various locations *after* January 11. These included:

- Susan Weaver, a Walmart employee, remembered selling Mr. Mueller a very large quantity of water by the gallon. Tr. at 5832-36. Store records show this purchase was made on January 22, 1996 – eleven days after the Government claimed the murders had occurred. Tr. at 6364-65.

- Mary Reid, a longtime friend of the Muellers, spoke with William and Nancy Mueller in the parking lot outside of her bank on January 18, 1996. Tr. 5856-57, 5886.[13] Authorities confirmed that Ms. Reid was at the bank on January 18 based on her bank transaction records and surveillance footage, Tr. 5870-71, 5885-87, 5889, 5891-92, and relied upon her statement to secure a search warrant during the murder investigation. Tr. 5888-90.

- Janis Rowlands, a schoolteacher, contacted authorities to report she saw the Muellers at a Walmart in Russellville on February 2 or February 3. Tr. 5798-5800, 5802. Ms. Rowland remembered it was a day when her school was closed due to inclement weather, and

---

on the basis of the evidence already presented, and that it could not reopen the record to receive additional evidence. Tr. 7100.

[13] The Muellers were in a car with several other men, including Paul Humphrey, an early suspect in the case because he was in possession of the title to the Muellers' Jeep. Tr. 5859, 5867-68, 5877, 5880-82.

26

Appellate Case: 19-2432     Page: 29     Date Filed: 09/06/2019 Entry ID: 4827942

records corroborated that her school district was closed on February 2, 1996, due to the weather. Tr. 6080-81.

- Lucy Carr, a manager at Leonard's Hardware Store in Russellville, called authorities to let them know she had a conversation with William Mueller in her store in early February. Tr. 5807-11. Ms. Carr testified that Mr. Mueller looked like he was trying to disguise himself; he was unshaven and was wearing a large floppy hat. Tr. 5814.

- Sue Sullivan, an employee at Leonard's Hardware Store in Russellville, testified that she saw Mr. Mueller in the store around February 6 or 7, right before an article had been published in the local paper about the Muellers having gone missing. Tr. 5817.

- Ester Anderson, an acquaintance of the Muellers, testified that she had driven past the Muellers' home on January 17 with her husband and saw their Jeep and attached trailer parked outside. Tr. 5961, 5963. She was sure of the date because she was accompanying her husband to a job interview for which he subsequently filled out some paperwork dated January 22, and she knew from her own records that the 17th was the one day that week that she had not gone to work. Tr. 5962-63, 5966.

Unlike Gloria and Cheyne, these were neutral witnesses. They had no reason to lie or shape their testimony to help or hurt the Government's case.

Even on their own terms, Gloria's and Cheyne's stories were riddled with contradictions and inconsistencies. Their testimony about how the murders were carried out contradicted the autopsy reports as well as forensic evidence collected at the Muellers' home. Doc. No. 1297 at 38-39. Their accounts changed over time to comport with the prosecution's case. *See id*. at 39-40 (collecting examples). Gloria Kehoe, for example, originally told authorities that Mr. Lee and her son

27

Appellate Case: 19-2432    Page: 30    Date Filed: 09/06/2019 Entry ID: 4827942

lingered in Arkansas for several days after committing the murders, watching for media reports. By trial, that part of her story–which was contrary to the Government's timeline–had been dropped. *Id.* at 39.

Gloria initially claimed that only Chevie had confessed to her. Two weeks later, she revised her story to say that Mr. Lee had also confessed, though she could not remember *any* of the details. By the time of the trial a year later, she claimed to remember numerous details of Mr. Lee's alleged confession, including exact phrases he used, even though she originally told authorities that it was Chevie who told her these particular details about the crime. *Id.*

Absent Cheyne's and Gloria's testimony, there is no longer any reliable evidence that Mr. Lee participated in the Mueller murders. Indeed, when pressed below on what evidence remains to establish guilt, the only other piece of evidence the Government could point to is circumstantial at best: a fingerprint found on a display case in a storage unit in Spokane that Mr. Lee entered on a regular basis. Doc. No. 1307 at 36. Even the Government's own fingerprint expert testified there was no way to determine the age of a print or when it might have been deposited on the display case. Tr. 3716.[14] That evidence could hardly stand on its own or be considered "overwhelming" given these substantial shortcomings.

---

[14] Given that the Government's own evidence established that this display case was kept in a storage unit at the Shadows Motel, and that Mr. Lee *was living out of that same storage unit* and would sleep there, Tr. 2856-57; 2915; 4815;

28

Appellate Case: 19-2432     Page: 31     Date Filed: 09/06/2019 Entry ID: 4827942

That is precisely why the favorable evidence concerning Mr. Wanker is material. Once the "matching hair" evidence was conclusively refuted by post-conviction DNA testimony, Mr. Wanker's trial testimony was the only remaining evidence that appeared to corroborate the Kehoes' testimony. Now that this, too, has been debunked, the case against Mr. Lee looks quite different—and substantially weaker—than the one presented at trial. Given the jury's acquittals on the charges that relied exclusively on Cheyne's and Gloria's testimony, one must assume the jury relied extensively on the hair evidence and Mr. Wanker's testimony to convict Mr. Lee of the Mueller murders. Moreover, if the jury had known that the hair evidence was false and had discounted what Mr. Wanker had heard, it is reasonably likely they would have given more weight to the defense's attack on the Government's timeline of events. As even the Government has acknowledged: "Had the jury not accepted the government's time line, Lee could not have been convicted."[15]

The Supreme Court has instructed that a properly-conducted *Brady* materiality analysis is not a sufficiency of the evidence test. Mr. Lee does not have to prove that after discounting the effect of the suppressed evidence, he would have

---

5312, this evidence had little, if any, probative value as to whether Mr. Lee was at the crime scene.

[15] *See* Doc No. 1126-1 at 33.

been acquitted. *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. Respectfully, the district court did not conduct this analysis. Therefore, it is debatable by jurists of reason whether, viewed in light of all of the evidence, Mr. Lee received a trial resulting in a verdict worthy of confidence. A COA should issue on this claim.[16]

---

[16] Even the district court's analysis of the Wanker information in isolation is debatable by jurists of reason. The Court wrote that Mr. Wanker's present declaration does not "materially change his testimony" because he testified at trial that he thought Mr. Lee was just "talking to hear himself talk." Doc. No. 1313 at 13. Respectfully, this is incorrect. The cited trial testimony was made directly in response to a discrete challenge levied on cross-examination about why Mr. Wanker did not immediately alert authorities when he heard the confession. The district court failed to account for the fact that defense counsel could not ask Mr. Wanker more because he lacked prior access to the witness—Mr. Wanker was a surprise witness, disclosed to the defense less than 48 hours before taking the stand—so defense counsel had no idea how he might answer. *See, e.g.,* APP at A4-A5 (Declaration of Jack T. Lassiter) at ¶ 11 (noting that "the very fact that the government brought [Wanker] all the way from Spokane and put him on the stand to testify against Mr. Lee suggested to me that he would not have given me a favorable answer [about whether he had changed his opinion]"). Mr. Wanker's overall testimony clearly left the jury with the impression that even though he did not take the comment seriously at the time, he had changed his opinion since then. The Government cemented this impression in closing when it argued that the purported confession was especially reliable because Mr. Wanker was an unbiased witness with "no reason … to come in here and tell you that story unless it's the truth." Tr. 7002.

Appellate Case: 19-2432     Page: 33     Date Filed: 09/06/2019     Entry ID: 4827942

## b. Under Arkansas law, co-conspirator testimony cannot be relied on absent substantive corroboration.

Because Arkansas crimes were alleged as several of the predicate offenses supporting the RICO charges, Mr. Lee's jury was instructed under Arkansas procedural rules.[17] Pursuant to Arkansas law, the testimony of an accomplice must be corroborated with substantive evidence "directed toward proving the connections of the accused with the crime and not directed toward corroborating the accomplice's testimony." *Martin v. State*, 57 S.W.3d. 136, 202 (Ark. 2001). Such evidence is sufficient "if the testimony of the accomplice were totally eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission." *Id.* at 203.

Mr. Lee's jury was specifically instructed by the court that

> Cheyne Kehoe and Gloria Kehoe, according to their own testimony, were, with respect to some of the Racketeering Acts charged [i.e. the murder and robbery of the Muellers], what are known as accomplices…You cannot, therefore convict a defendant of the Racketeering Acts involving Arkansas law – that's Four A, Four B, Five and Six upon the testimony of those witnesses unless that testimony is corroborated by other evidence tending to connect the defendants with the commission of the offenses.

Tr. at 7038.

---

[17] As this Court noted in Chevie Kehoe's direct appeal, although "Arkansas procedural rules generally do not govern a federal trial; they govern here…because the government did not object…" *United States v. Kehoe*, 310 F.3d 579, 591 (8th Cir. 2002) (citing *United States v. Young*, 702 F.2d 133, 136 (8th Cir. 1983)).

31

Viewed in the totality of what has since been learned about Mr. Lee's case, there is a reasonable probability that at least one juror considering the evidence would have found insufficient corroboration to credit the accomplice testimony of Cheyne and Gloria Kehoe. If the jurors discounted Mr. Wanker's testimony, there is no remaining evidence that independently establishes the crime and connects Mr. Lee with its commission.

This fact is made clear by comparing this Court's analysis of the issue in Chevie Kehoe's case. The evidence this Court relied upon in Mr. Kehoe's direct appeal to find sufficient corroboration as to Kehoe is wholly absent as to Mr. Lee. *See United States v. Kehoe¸* 310 F.3d 579, 591-92 (8th Cir. 2002). For example, this Court noted that Mr. Kehoe and Mr. Lee had no money while in Oklahoma and a few days later "they were comparatively wealthy." *Id.* at 592. The evidence at trial, however, only showed this as to Mr. Kehoe. No witness testified that Mr. Lee was flush with cash. Likewise, the paint chips recovered with the bodies that were similar to the paint on Kehoe's vehicle is evidence that tends connect the Kehoes to the Mueller murders but does nothing to corroborate the accomplice testimony as to Mr. Lee. The only evidence alleged to have been specific to Mr. Lee fails to provide sufficient corroboration. Mr. Lee's fingerprint taken from a display case stored in the area where he was living in Washington State merely shows that Mr. Lee touched an item located in the room where he slept. It does

32

nothing to connect Mr. Lee to the crime scene. In fact, the only piece of evidence directly implicating Mr. Lee in the murder of the Mueller family was a hair that DNA testing has since excluded as Mr. Lee's. The fact that Mr. Lee possessed or sold stolen firearms in Washington State also fails to connect Mr. Lee with commission of the crime. Multiple persons, including several Government witnesses like Travis Brake and Sean Haines, possessed and sold firearms stolen from the Muellers. There is nothing unique or compelling in that fact that would lead a reasonable juror to find it sufficient to corroborate the accomplice witness testimony.

Applying the Arkansas standard, prejudice here is clear: if the testimony of Gloria and Cheyne Kehoe were "totally eliminated" from the case, *Martin*, 57 S.W.3d at 203, and the suppressed Wanker evidence had been disclosed, it is probable that at least one juror would have found insufficient evidence to independently establish the crime and to connect Mr. Lee with its commission.

<blockquote>

**c.    The district court failed to consider the collateral effects of the Wanker information in its materiality analysis.**

</blockquote>

Mr. Wanker's declaration is material in another respect: it disclosed a number of questionable practices in which the Government engaged in building its case against Mr. Lee. A properly conducted materiality analysis must consider how the jury would have received Mr. Wanker's evidence had that information come

33

Appellate Case: 19-2432    Page: 36    Date Filed: 09/06/2019 Entry ID: 4827942

out on cross-examination. As *Kyles* clarified, a cumulative materiality analysis must account not only for the direct impact of the suppressed evidence but its collateral effects as well. *See Kyles* at 445-46 (evidence would have allowed jury to also question reliability of investigation).

In Mr. Lee's case, these effects include the possible impact on the jury if it had learned that Mr. Wanker had been instructed by authorities to limit his testimony on the stand; that law enforcement reports of his previous statements had been crafted to exclude exculpatory evidence; and that his grand jury testimony was manipulated to omit information that was not consistent with the Government's theory of the case. As the Supreme Court noted in *Kyles,* exposure of these types of prosecutorial tactics can do profound damage to the prosecution's case because they call into question "the thoroughness and even the good faith of the investigation" upon which the case was built. *Kyles*, 514 U.S. at 445. *See also id*. at 449 (disclosure of *Brady* material "could have been used to cap an attack on the integrity of the investigation and on the reliability of [the lead detective]"). The district court's failure to consider this dimension of the materiality analysis demonstrates that its resolution of the claim was fundamentally flawed, and at least debatable by jurists of reason.

Appellate Case: 19-2432     Page: 37     Date Filed: 09/06/2019 Entry ID: 4827942

### 2. The district court failed to address a separate theory of materiality.

As Mr. Lee argued in his motion, disclosure of the *Brady* information would have allowed trial counsel not only to impeach Mr. Wanker's testimony about Mr. Lee's alleged confession, but also to move to *exclude* it.[18] *See White v. Helling*, 194 F.3d 937, 943-46 (8th Cir. 1999) (*Brady* encompasses information relevant to the admissibility of evidence; prosecution's failure to disclose *Brady* material regarding witness's pre-trial identification "might have led the trial court to exclude [witness's in-court identification of defendant] altogether").[19] This is confirmed by trial counsel himself. *See* APP at A4 (Declaration of Jack T. Lassiter) at ¶ 9 ("I would have certainly wanted to have known about this information because it indicated that the underlying statement was not trustworthy or reliable. If this information had been disclosed to me, I would have moved to exclude the statement under the Federal Rules of Evidence.")

Mr. Lee's purported admission to Mr. Wanker was ostensibly admissible as a statement against penal interest by an unavailable declarant. *See* Fed. R. Evid.

---

[18] *See* Doc. No. 1297 at 4 ("Had the defense been privy to this information, they would have discredited *or moved to exclude Mr. Wanker's testimony*[.]") (emphasis added).

[19] *See also* United States Attorneys' Manual at § 9-5.001.C.2 (acknowledging that *Brady* encompasses information that "might have a significant bearing on the admissibility of prosecution evidence").

35

804(b)(3). Under then-prevailing (and current) circuit law, however, such a statement was not admissible unless it satisfied three prongs:

(1) the declarant is unavailable as a witness;

(2) the statement must so far tend to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true; and

(3) corroborating circumstances clearly indicate the trustworthiness of the statement.

*See United States v. Mendoza*, 85 F.3d 1347, 1351 (8th Cir. 1996) (quoting *United States v. Riley*, 657 F.2d 1377, 1383 (8th Cir. 1981). Here, the statement would not have satisfied the criteria for admission because there were no corroborating circumstances that *clearly* indicated the trustworthiness of Mr. Lee's statement. The suppressed evidence actually established the opposite. Indeed, Mr. Wanker had repeatedly warned authorities of this very problem every time he was interviewed about the statement.

Mr. Lee's alternate *Brady* claim based on the exclusion of the statement was, at the very least, debatable by jurists of reason. *See*, *e.g.*, *Smith v. United States*, 666 A.2d 1216, 1224-25 (D.C. 1995) (witness statement should have been disclosed under *Brady* because it called into question whether prosecution's evidence could be properly admitted under exception to hearsay rule); *James v. United States*, 580 A.2d 636, 645-47 (D.C. 1990) (same). Yet the district court did not address this issue, even after Mr. Lee specifically alerted the court that it had

36

omitted it from its ruling on the *Brady* claims. *See* Doc. No. 1317 at 7-8. The mere fact that the district court failed to resolve the issue warrants granting a COA. *See United States v. Espinoza*, 421 Fed. Appx. 817 (10th Cir. 2010) (summarily granting COA and remanding where district court failed to address *Brady* issue).

The district court's failure to consider this issue was not insignificant; it fundamentally altered the prejudice analysis. The district court was required to consider the totality of the evidence as if the purported confession had never been introduced at all, rather than the relative weight the purported confession might have been given in light of the *Brady* material. As noted above, absent the corroboration provided by the hair evidence and Mr. Wanker's testimony, the jury's acquittals on the other racketeering acts indicates a reasonable probability that the jury would not have convicted Mr. Lee of the Mueller murders on the basis of Gloria's and Cheyne's word alone. Moreover, given that the jury was instructed under Arkansas law regarding accomplice testimony, *see supra*, if Mr. Wanker's testimony had been excluded, then the jury would have been precluded from convicting Mr. Lee based on Gloria's and Cheyne's uncorroborated testimony.

**B.    Reasonable jurists can disagree whether a *Brady* claim based on material evidence requires preauthorization.**

The district court alternately held that a subsequent § 2255 motion asserting a *Brady* violation, whether material or not, is a second or successive motion that requires authorization by this Circuit. Doc. No. 1313 at 14-17. Reasonable jurists

37

not only *could* disagree with the district court's resolution of this issue, another district judge in the Eastern District of Arkansas in fact *has* disagreed.

### 1. The district courts in the Eastern District of Arkansas are split on this issue.

*Carter v. Kelley*, No. 5:16-cv-367-DPM-PSH (E.D. Ark. 4/25/17), like Mr. Lee's case, concerned a *Brady* claim raised in a second-in-time habeas petition. The magistrate judge, at the Government's urging, recommended the *Brady* claim be dismissed for failure to obtain circuit authorization to file a successive motion. The district court, however, rejected the magistrate's recommendation. Citing this Court's opinion in *Crawford v. Minnesota*, 698 F.3d 1086 (8th Cir. 2012), the district court (the Honorable D.P. Marshall, Jr. presiding) concluded that the Eighth Circuit imposes no such requirement on material *Brady* claims. *See* APP at A14 (Order in *Carter v. Kelley*) ("[I]f [petitioner's] *Brady* claim is material, then a second-in-time petition may not be 'second or successive' within the meaning of AEDPA.") (citing *Crawford*, 698 F.3d at 1091).

Judge Marshall's interpretation of *Crawford* was correct.[20] This Court pointedly refrained from adopting the expansive view that "all *Brady* claims in

---

[20] After finding in *Carter* that the *Brady* claim was non-material, and thus that the petition required pre-authorization, Judge Marshall ordered that the case be transferred to the Eighth Circuit for further consideration. *Carter v. Kelley*, 2017 WL 4214084 (E.D. Ark. 9/21/17). Notably, the Eighth Circuit summarily denied the petitioner's subsequent request for pre-authorization, but otherwise gave no indication that Judge Marshall's interpretation of *Crawford* was incorrect or that

38

second habeas petitions are second or successive regardless of their materiality." *Crawford*, 698 F.3d at 1091. It only recognized that non-material *Brady* claims require pre-authorization. *Id*. In fact, the *Crawford* court explicitly refused to join the reasoning and conclusions of the several circuits that had adopted the alternate view on this issue. *Id*. at 1090.

Given that two reasonable jurists in the same judicial district have come to opposite conclusions as to whether material *Brady* claims raised in a second-in-time habeas petition require preauthorization, the debatability of this issue is self-evident. *See also Scott v. United States*, 890 F.3d 1239 (11th Cir. 2018) (refuting prior panel's reasoning on this issue in *Tompkins v. Sec'y, Dep't of Corrections*, 557 F.3d 1257 (11th Cir. 2009) (*per curiam*)).

### 2. The district court's definition of "ripeness" in assessing whether a claim is "second or successive" is debatable.

Mr. Lee argued below that his *Brady* claims cannot be considered successive inasmuch as he was unable to raise these claims previously because the Government had concealed the evidence. In other words, his *Brady* claim was unripe until the violation was discovered.[21] In making this argument, Mr. Lee

---

his decision to conduct a preliminary materiality analysis was improper. *See Carter v. Kelley*, No. 17-3076, Entry ID: 4644737 (8th Cir. 3/29/18).

[21] *See Deroo v. United States*, 709 F.3d 1242 (8th Cir. 2013), *citing Singleton v. Norris*, 319 F.3d 1018, 1023 (8th Cir. 2013) (*en banc*) ("[A]" habeas

Appellate Case: 19-2432     Page: 42     Date Filed: 09/06/2019 Entry ID: 4827942

relied on *Panetti v. Quarterman*, 551 U.S. 930 (2007), in which the Supreme Court held that a competency-to-be-executed claim ("*Ford* claim") raised in a second habeas petition was not "second or successive" for purposes of the preauthorization requirement because the basis for raising the claim had not developed until after the first habeas petition had already concluded.

The district court factually distinguished *Brady* claims from *Ford* claims by creating a new test not found in *Panetti*.[22] In particular, the district court held that a claim's "ripeness" depends on when the violation supporting the claim occurred. Doc. No. 1313 at 16. And since a *Brady* violation happens during trial or sentencing, the district court reasoned that any claim based on a *Brady* violation must necessarily be "ripe" when the first habeas motion is filed. *Id.*

There are multiple problems with this reasoning. First, the Supreme Court in *Panetti* did not purport to define the word "ripe."[23] In fact, the district court's

---

petition raising a claim that had not arisen at the time of a previous petition is not barred by § 2244(b) or as an abuse of the writ.").

[22] The *Panetti* Court concentrated on three different generally applicable factors to determine whether a claim is "second or successive": the "implications for habeas practice," AEDPA's purposes, and the abuse-of-the-writ doctrine. *Panetti*, 551 U.S. at 945-47. None of these factors applies uniquely to *Ford* claims. Nor does any factor apply in such a way as to only permit litigation of *Ford* claims.

[23] Similarly, none of the circuit court cases relied upon by the district court cite to anything in *Panetti* to support this narrow definition of the term.

Appellate Case: 19-2432    Page: 43    Date Filed: 09/06/2019 Entry ID: 4827942

definition conflicts with how the term is generally understood in the law.

"Ripeness" refers to "[t]he state of a dispute that has reached, but has not passed, the point when the facts have developed sufficiently to permit an intelligent and useful decision to be made." *Ripeness*, Black's Law Dictionary (10th ed. 2014). But when, through no fault of the petitioner, a *Brady* violation goes undiscovered through trial and sentencing, the facts concerning a claim based on that violation have not been developed sufficiently to permit an intelligent and useful decision to be made. Indeed, they have not been developed at all until such time as the *Brady* violation is discovered.

Second, and even more significantly, to the extent that *Panetti* referred to ripeness as a consideration within its framework for evaluating whether a second-in-time claim is "second or successive," the district court's definition of "ripeness" cannot be harmonized with *Panetti*'s. *Panetti* accounted for what it referred to as ripeness only for the purpose of evaluating the implications for habeas practice of holding an unripe claim to be "second or successive." *Panetti*, 551 U.S. at 943-45. Specifically, it expressed concern that holding unripe claims to be "second or successive" would flood the courts with useless claims on the off chance that such claims might later ripen. *Id*. at 943. But that is true of *Brady* claims, too: Because of the nature of a *Brady* violation, the petitioner often cannot learn of such a violation at all, even when acting diligently, due to the Government's suppression

41

of the information. As with second-in-time *Ford* claims, then, "conscientious defense attorneys would be obliged to file unripe (and, in many cases, meritless) [*Brady*] claims in each and every [first § 2255] application [(and direct appeal)]," *Panetti*, 551 U.S. at 943, to preserve then-hypothetical claims on the chance that the Government might have committed a material *Brady* violation that will eventually be disclosed. Also, as with *Ford* claims, the courts would be forced to address this avalanche of substantively useless *Brady* claims—only there would be even more meritless *Brady* claims because *Brady* does not apply only in capital cases, like *Ford* does. For this reason, finding second-in-time *Brady* claims to be "second or successive" under § 2255 would have even more deleterious effects on habeas practice than concluding second-in-time *Ford* claims were "second or successive."

There are also compelling policy reasons to not treat valid *Brady* claims as successive. If the Court imposes restrictions on a habeas petitioner due to the Government's suppression of evidence, it would reward the prosecution for continuing to hide evidence. Such a rule is inconsistent with the purpose of the Great Writ.

Given how far the district court departed from *Panetti*, as well the adverse implications its interpretation of "ripeness" would have on habeas practice, the district court's resolution of this issue is debatable by jurists of reason. *Cf. Scott*,

42

Appellate Case: 19-2432     Page: 45     Date Filed: 09/06/2019 Entry ID: 4827942

890 F.3d at 1259 (faced with binding circuit precedent requiring conclusion that, in § 2255 cases, second-in-time *Brady* claims are "second or successive" under § 2255(h), panel notes that this conclusion conflicts with *Panetti v. Quarterman* and "effects a suspension of the writ of habeas corpus as it pertains to the narrow issue of *Brady* claims" because it would deprive federal prisoners of a "full and fair opportunity to obtain relief," and *sua sponte* urges rehearing *en banc*).

## IV. A COA should issue on whether the district court improperly denied Mr. Lee's Rule 60(b)(3) motion.

Rule 60(b)(3) provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding for the following reasons… (3) fraud … misrepresentation, or misconduct by an opposing party." Here, Mr. Lee alleged that the Government had engaged in a sustained pattern of misconduct designed to conceal the Wanker information from the defense beginning during the pre-trial stage and continuing through the post-conviction proceedings.

Shortly after their appointment, counsel for Mr. Lee filed several pre-trial motions requesting that the Government reveal all information and material known to it that might be favorable to Mr. Lee pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Doc. Nos. 28, 31. The Government responded that it "recognize[d] its obligation under *Brady v. Maryland*," that it would "provide all *Brady* material as required by law," and that it would "treat this motion as

43

Appellate Case: 19-2432     Page: 46     Date Filed: 09/06/2019 Entry ID: 4827942

continuing." Doc. No. 55 at 2. At a subsequent pretrial conference, the prosecution represented that the "bulk" of the *Brady* material had already been disclosed to the defense. 4/9/98 Tr. at 32. The Court thereafter entered an order dismissing Mr. Lee's *Brady* motion as moot, while also directing the Government to provide defense counsel with any discovery to which Mr. Lee was entitled "on a continuing basis as it is received." Doc. No. 145 at 1, 3. The Government produced no additional *Brady* material pursuant to this order, and Mr. Lee otherwise had no basis to believe such material existed given the Government's representations.

Nevertheless, when Mr. Lee filed his initial § 2255 motion, his habeas counsel included a general allegation that the Government had improperly withheld information favorable to the defense in violation of its constitutional *Brady* obligations. Doc. No. 1118-1 at 7. Counsel had no facts to support the allegation that the Government had suppressed any information, but sought to preserve the issue in the event that any information came to light that would warrant amending the § 2255 motion to raise a specific *Brady* claim. In its response, the Government did not directly address the *Brady* claim but simply noted that it had previously provided a "huge amount" of discovery to trial counsel. Doc. No. 1126-1 at 45 n.16. The Government made no additional disclosures, and, once again, Mr. Lee had no basis to believe any *Brady* material existed given the Government's representations. The § 2255 issue was thus

44

rendered moot; the district court's order denying relief did not even address counsel's request for discovery of *Brady* information, much less the allegation raised in the § 2255 motion.

We now know that the Government's representations were false. Its failure to produce the requested discovery during the § 2255 proceedings deprived Mr. Lee of the ability to raise *Brady* claims concerning the Wanker information in that proceeding. Hence Mr. Lee's Rule 60 motions: the Government perpetrated a fraud that prevented him from fully and fairly litigating his § 2255 motion.[24]

The district court did not dispute that Mr. Lee's claim was properly cognizable in a Rule 60(b) motion. *See* Doc. No. 1313 at 18. Instead, the court denied the motion on the grounds that it was untimely and failed sufficiently to allege that the Government's misconduct interfered with Mr. Lee's ability to "fully and fairly" present his § 2255 motion. *Id*. at 18-19. Both rulings are debatable by jurists of reason.

---

[24] The Supreme Court has held that Rule 60(b) motions can properly be applied to habeas proceedings when they attack "not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the [previous] federal habeas proceedings." *Gonzalez v. Crosby*, 545 U.S 524, 532 (2005). "Fraud on the federal habeas court is one example of such a defect." *Id*., n.5.

Appellate Case: 19-2432     Page: 48     Date Filed: 09/06/2019 Entry ID: 4827942

**A. Reasonable jurists can disagree whether the district court lacked authority to extend the deadline.**

Ordinarily, a Rule 60(b)(3) motion must be filed no more than a year from the order or judgment that it seeks to set aside. Fed. R. Civ. P. 60(c)(1). Mr. Lee's 60(b) motion was deemed "untimely" because the § 2255 judgment that it sought to set aside was issued in 2008. Doc. No. 1313 at 19. The district court ruled that it had "no authority to extend that deadline." *Id*. at 18. But that ruling is debatable by jurists of reason because the district judge failed to consider that the deadline could be equitably tolled.

**1. The one-year limit under Rule 60(b)(3) is non-jurisdictional, so it can be equitably tolled.**

As the district court correctly recognized, the one-year time limit is not jurisdictional. *Id*. Rather, the filing deadline is a claim-processing rule – that is, a "court-made rule" that can be forfeited if not properly asserted by the opposing party. [25] The district court reasoned that since the Government properly raised the time limit, the court had no authority to extend the deadline. *Id*. But the court's reasoning was incorrect because it did not address the availability of equitable tolling.

---

[25] *See Hamer v. Neighborhood Housing Servs. of Chicago*, 583 U.S. ___, 138 S.Ct. 13, 16-17 (2017) (describing difference between jurisdictional deadline and mandatory claim-processing rule).

46

"It is hornbook law that limitations periods are customarily subject to equitable tolling." *Young v. United States*, 535 U.S. 43, 49 (2002) (internal quotation marks and citation omitted). Even as to so-called "mandatory" claim-processing rules, the Supreme Court reaffirmed just months ago that there may be circumstances where tolling the limitations period is justified. *See Fort Bend Cty. v. Davis*, 587 U.S. ___, 139 S. Ct. 1843, 1849 n.5 (June 3, 2019) ("The Court has reserved whether mandatory claims-processing rules may ever be subject to equitable exceptions.") (internal quotation marks and citation omitted).[26] Mr. Lee's case squarely presents such a circumstance.

As a general matter, motions under Rule 60(b) are consonant with the doctrine of equitable tolling because the rule itself "represents an effort to codify the equitable practice with respect to the correction of judgment after the time for appeal has expired." *Lafferty v. District of Columbia*, 277 F.2d 348, 351 n.6 (D.C. Cir. 1960).[27] Thus, Rule 60(b) is distinguishable from other mandatory claim-processing rules because its animating principle is a concern for equity rather than

---

[26] *See also Nutraceutical Corp. v. Lambert*, 586 U.S. ___, 139 S.Ct. 710, 714-15 n.7 (leaving open whether equitable tolling might apply where a litigant was "misled" about the filing deadline, or "whether an insurmountable impediment to filing timely might compel a different result").

[27] *See also In re Brown*, 68 F.R.D. 172, 174 (D.D.C. 1975) (describing Rule 60(b) as codification of various methods for gaining equitable relief from judgments).

Appellate Case: 19-2432     Page: 50     Date Filed: 09/06/2019 Entry ID: 4827942

the strict enforcement of time limits. *See Gonzalez*, 545 U.S. 524, 529 (describing Rule 60(b) as a "provision whose whole purpose is to make an exception to finality").

Equitable tolling is particularly warranted where, as here, the fraud goes undiscovered because the opposing party has taken positive steps after its commission to keep it concealed. *See In re Benjamin's-Arnolds, Inc.*, 1997 WL 86463, *10 n.9 & *11 n.10 (Bankr. D. Minn. Feb. 28, 1997) (doctrine of equitable tolling would act to toll one-year limitations period of Rule 60(b)(3) until time fraud is actually discovered); *see also Holmberg v. Ambrecht*, 327 U.S. 392, 396-97 (1946) (noting that "fraudulent conduct on the part of the defendant may have prevented the plaintiff from being diligent and may make it unfair to bar appeal to equity because of mere lapse of time" and thus concluding that limitations period does not begin to run until fraud is discovered). To hold otherwise would unfairly reward a party for managing to successfully conceal its fraud beyond the one-year limitations period. *Holmberg*, 327 U.S. at 396-97 (equity "bars [the United States] from setting up … a fraudulent defense, as it interposes against other forms of fraud.").[28]

---

[28] *Cf. Julius v. Jones*, 875 F.2d 1520, 1525 (11th Cir. 1989) (To overcome procedural bar, defense not required to "ferret out the violation;" duty is on prosecution and any ruling otherwise "would reward the wrongdoer because he was not timely found out;" defense may "rely on a belief that prosecutors will comply with the Constitution and will produce *Brady* material on request").

Appellate Case: 19-2432     Page: 51     Date Filed: 09/06/2019 Entry ID: 4827942

Indeed, consider the Government's conduct here: Mr. Lee's habeas counsel reasonably relied on the Government's repeated assurances at both trial and in the § 2255 proceedings that it had complied with *Brady*. *See Strickler v. Greene*, 527 U.S. 263, 284 (1999) ("[I]f it was reasonable for trial counsel to rely on … the presumption that the prosecutor would fully perform his duty to disclose all exculpatory material … we think such reliance by [post-conviction] counsel was equally reasonable.") But it was precisely this reliance that allowed the Government to continue to conceal the Wanker information throughout § 2255 proceedings.

It would be a perverse result to penalize the party that relied on the false representations, rather than the party that made them. *See Strickler*, 527 U.S. at 263 (defendant cannot litigate on basis of speculation but is entitled to rely on representations of prosecution). Because the Government misled Mr. Lee and thereby directly impeded his ability to timely raise a *Brady* claim concerning the Wanker information during his § 2255 proceedings, or even raise a timely Rule 60(b)(3) motion, equitable tolling was warranted here. *See Curtiss v. Mount Pleasant Corr. Facility*, 338 F.3d 851, 855 (8th Cir. 2003) (circumstances warranting equitable tolling include state conduct that "lulled the petitioner into inaction"); *Pliler v. Ford*, 542 U.S. 225, 235 (2004) (O'Connor, J., concurring) ("if

49

the petitioner is affirmatively misled … by the State, equitable tolling might well be appropriate").

Given the availability of equitable tolling for motions made pursuant to Rule 60(b), the district court's ruling that it had "no authority" to extend the one-year time limit is debatable by jurists of reason. Thus, a COA should issue on this claim.

### 2. The district court's failure to address the equitable tolling issue requires a remand.

After the Government raised the affirmative defense of timeliness, Mr. Lee responded by arguing that the limitations period should be equitably tolled. *See* Doc. No. 1312 at 24-25. The district court, however, failed to address that issue in its order denying the Rule 60(b)(3) motion. *See* Doc. No. 1313 at 18-19.

Mr. Lee thereafter filed a Rule 59 Motion and again asked the district court to address the issue of equitable tolling. *See* Doc. No. 1317 at 11-13. Although the district court acknowledged that Mr. Lee had argued that "the Rule 60(b)(3) limitations period should be equitably tolled due to special circumstances," *see* Doc. No. 1318 at 1, it again failed to rule on the issue.

When a district court fails to address an issue presented for its consideration, the proper course is to summarily grant a COA on that issue and remand for further proceedings. *See United States v. Luera*, 212 F.3d 594 (5th Cir. 2000) (noting that appellate court "lacks jurisdiction to consider whether to grant or deny a COA

50

regarding an issue that was not considered first by the district court"; summarily granting COA and remanding). This is especially true where a district court has failed to consider the issue of equitable tolling because it is a highly fact-dependent inquiry. *See Astorga v. Terhune*, 37 Fed. Appx. 284, 285-86 (9th Cir. 2002) (granting COA where district court erred in failing to address petitioner's equitable tolling argument and noting that because the "determination of whether there are grounds for equitable tolling is highly fact-dependent," the district court "is in a better position to develop the facts and assess their legal significance in the first instance") (internal quotation marks and citation omitted); *Brown v. Roe*, 279 F.3d 742 (9th Cir. 2002) (same).

Given the district court's repeated failure to issue a ruling on the issue of equitable tolling, a COA should be summarily granted and this case should be remanded so that the district court can make a determination as to equitable tolling. Should the court rule in Mr. Lee's favor, it would narrow the issues on appeal.

**B.      Reasonable jurists can disagree whether there was fraud, misrepresentation or misconduct by the opposing party under Rule 60(b)(3).**

As the district court readily acknowledged, a party's failure to produce evidence requested in discovery is cognizable as "fraud" under Rule 60(b)(3). *See*

51

Doc. No. 1313 at 19.[29] Here, however, the district court ruled that Mr. Lee did not show "that the failure was due to misconduct by the party that should have produced the evidence." *Id*. Specifically, the Court stated that "Lee has not alleged facts to show that the omission of any evidence during his § 2255 proceeding was due to the Government's misconduct or that the Government intentionally misrepresented any facts." *Id.* Given that the district court's characterization is contradicted by the record, reasonable jurists could disagree with its resolution of these issues.

### 1. Mr. Lee alleged that the Government's failure to produce *Brady* information was the result of a pattern of misconduct.

Mr. Lee has consistently alleged that the Government engaged in a demonstrable pattern of misconduct that spanned the entirety of the pre-trial, trial, and post-conviction proceedings in order to suppress the relevant *Brady* information. This misconduct includes:

- intentionally failing to memorialize Mr. Wanker's warnings in official reports;

---

[29] *See also Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994) ("an adverse party's failure, either inadvertent or intentional, to produce such obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)"); *Stridiron v. Stridiron*, 698 F.2d 204, 207 (3d Cir. 1983) (failure to produce requested discovery material can constitute Rule 60(b)(3) misconduct); *Square Construction Co. v. Washington Metro. Area Transit Auth.*, 657 F.2d 68, 71 (4th Cir. 1981) (same).

52

Appellate Case: 19-2432    Page: 55    Date Filed: 09/06/2019 Entry ID: 4827942

- instructing Mr. Wanker to omit this information from his trial testimony;

- failing to correct Mr. Wanker's substantially misleading trial testimony;

- shaping Mr. Wanker's grand jury testimony to omit facts inconsistent with the Government's theory of the case;

- falsely representing to this Court that it had complied with its constitutional obligations under *Brady* to turn over all relevant materials to the defense prior to trial; and

- repeating that fraudulent claim in the § 2255 proceedings in response to counsel's renewed request for such materials.

Mr. Lee's allegations about the Government's interactions with Mr. Wanker were supported by a signed, sworn declaration from the man himself. The Government had multiple opportunities to respond to the substance of these allegations in the proceedings below. Notably, it did not dispute them. Based on these facts, reasonable jurists could disagree with the district court's determination that Mr. Lee "has not alleged facts to show that the omission of any evidence during his § 2255 proceeding was due to the Government's misconduct or that the Government intentionally misrepresented any facts." Doc. No. 1313 at 19.

> **2.     Reasonable jurists can disagree whether the Government's misconduct prevented Mr. Lee from fully and fairly litigating his initial § 2255 motion.**

Mr. Lee proffered sufficient facts to satisfy the threshold showing under Rule 60(b)(3) that the omission of the relevant *Brady* information during the § 2255 proceeding was due to the Government's misconduct. Indeed, Mr. Lee's §

53

Appellate Case: 19-2432     Page: 56     Date Filed: 09/06/2019 Entry ID: 4827942

2255 counsel explicitly stated that the purpose of the post-conviction *Brady* request was to discover any facts within the Government's possession that would warrant amending the § 2255 motion to raise additional *Brady* claims. As noted above, Mr. Lee should not be faulted for reasonably relying on the Government's affirmative representations that it had fully complied with its *Brady* obligations.

Yet that is precisely what the district court did. It ruled that the Government's repeated failure to disclose the requested *Brady* evidence did not prevent Mr. Lee from "fully and fairly litigating his initial § 2255 claim" because he "could have interviewed Wanker before filing his first habeas petition." Doc. No. 1313 at 19. Respectfully, the premise of the court's argument is contrary to well-settled law, or, at the very least, debatable by jurists of reason.

In both *Strickler v. Greene* and *Banks v. Dretke*, 540 U.S. 668 (2004), the Supreme Court rejected the notion that "defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks*, 540 U.S. at 695-96. *See also Strickler*, 527 U.S. at 286-87. *Banks* is particularly instructive because it addressed an argument nearly identical to the one at issue here: whether a petitioner could have investigated and interviewed witnesses in search of prosecutorial misconduct before filing his first state habeas petition. As the Court noted, to focus the inquiry on whether the defendant could have uncovered the evidence despite the prosecution's fraudulent

54

Appellate Case: 19-2432      Page: 57      Date Filed: 09/06/2019 Entry ID: 4827942

representations would be incompatible with the due process concerns at the heart

of *Brady*:

> The State here … urges, in effect, that the prosecution can lie and conceal and the prisoner still has the burden to discover the evidence, so long as the potential existence of a prosecutorial misconduct claim might have been detected. A rule thus declaring "prosecutor may hide, defendant must seek" is not tenable in a system constitutionally bound to accord defendants due process.

*Banks*, 540 U.S. at 696 (internal quotation marks and citations omitted). As in

*Banks*, the Government here "represented at trial and in [post-conviction]

proceedings that [it] had held nothing back." *Id*. at 698. Thus, it "was not

incumbent on [Mr. Lee] to prove these representations false; rather [Mr. Lee] was

entitled to treat the prosecutor's submissions as truthful." *Id. See also id.* at 694

(Banks entitled to rely on prosecution's representation of full disclosure); accord

*Williams v. Taylor*, 529 U.S. 420, 443 (2000).

This principle has also long been recognized by the Eighth Circuit. *See*

*Parkus v. Delo*, 33 F.3d 933, 940 (8th Cir. 1994) (petitioner had cause for failing to

raise *Brady* claim in state court because his counsel on appeal and in state post-

conviction proceedings relied on prosecutor's representation to trial counsel that

"all relevant records and reports had been disclosed"); *Fairchild v. Lockhart*, 979

F.2d 636, 640 (8th Cir. 1992) (cause found for omission of *Brady* claim from

previous federal habeas petition where prosecutor told petitioner's counsel "that he

had turned over his entire file, thereby leading the attorney to believe that he had

55

Appellate Case: 19-2432    Page: 58    Date Filed: 09/06/2019 Entry ID: 4827942

received everything that existed"); *Bliss v. Lockhart*, 891 F.2d 1335, 1341 (8th Cir. 1989) ("prosecutorial interference with disclosure of the full evidence [by expressly or implicitly telling a witness to avoid a subject at trial] may indeed constitute cause").

The district court thus plainly erred in focusing the inquiry on whether Mr. Lee could have discovered the *Brady* information *in spite of* the Government's misconduct. At the very least, its approach to resolving the issue is debatable by jurists of reason. *See Scott v. United States*, 2016 WL 323902, \*3 (M.D. FL January 26, 2016) (granting relief pursuant to Rule 60(b)(3) to reopen § 2255 proceeding to determine whether newly disclosed *Brady* material affected prejudice analysis of any grounds raised in initial § 2255 motion).

## V.   A COA should issue on whether the district court improperly denied Mr. Lee's Rule 60(d)(3) motion.

Fed. R. Civ. P. 60(d)(3) provides federal courts with the "power to … set aside a judgment for fraud on the court." The district court held that Mr. Lee's allegations "do not clear [the] high bar" required to meet the standard for such fraud. Doc. No. 1313 at 20. But as the court recognized, fraud which is "directed to the judicial machinery itself" is cognizable under the Rule. *Id.* at 19. Given that Mr. Lee's allegations squarely concern a fraud that harmed the integrity of the judicial process, the district court's resolution of this issue is debatable by jurists of reason.

56

Appellate Case: 19-2432    Page: 59    Date Filed: 09/06/2019 Entry ID: 4827942

First, the Government's fraudulent representation that it had satisfied *Brady* was directed not simply at Mr. Lee, but also at the court itself. Mr. Lee's prior § 2255 motion raised two related issues for the court's adjudication: (1) a claim that the Government violated his constitutional rights by failing to disclose exculpatory and/or impeachment evidence, and (2) a request that the Government comply with its ongoing duty under *Brady* so that he could properly amend his § 2255 motion based on any disclosures. The Government's misconduct directly impeded the district court's ability to properly adjudicate both issues. By fraudulently representing that it had already fully complied, it essentially rendered the issues moot; indeed, the district court never formally adjudicated Mr. Lee's prior § 2255 claim or the request for additional *Brady* disclosures. Because Mr. Lee alleged that the Government's misconduct precluded the district court from properly adjudicating the issues before it in the § 2255 proceeding, he met the requisite standard to establish fraud on the court. *See Kerwit Medical Products, Inc. v. N & H Instruments, Inc.*, 616 F.2d 833, 837 (5th Cir. 1980) (fraud on the court "is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented

57

Appellate Case: 19-2432     Page: 60     Date Filed: 09/06/2019 Entry ID: 4827942

for adjudication"); *United States v. Smiley*, 553 F.3d 1137, 1145-46 (8th Cir.

2009).[30]

Second, the fraud in question concerns the concealment of *favorable*

information. As a number of courts have recognized, such conduct does not merely

prejudice the opposing party; it also constitutes a fraud on the court because it

harms the integrity of the adversarial process itself. *See Demjanjuk v. Petrovsky*, 10

F.3d 338, 348-56 (6th Cir. 1993) (Government's failure to disclose to courts and

detainee exculpatory information in its possession during denaturalization and

extradition proceedings constituted fraud on the court; although attorneys acted in

good faith, they recklessly disregarded their obligation to provide information

specifically requested by detainee, the withholding of which misled his counsel

and endangered his ability to mount defense); *Pumphrey v. K.W. Thompson Tool*

*Co.*, 62 F.3d 1128, 1130-34 (9th Cir.1995) (granting 60(b) based on fraud where

attorney failed to disclose favorable evidence and failed to correct false impression

it caused at trial).

Third, the very fact that the misrepresentations here were made by *officers of*

*the court* is sufficient to bring Mr. Lee's allegations within the ambit of Rule

60(d)(3). *See Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072,

---

[30] *See also Greiner v. City of Champlin*, 152 F.3d 787, 789 (8th Cir. 1998) (fraud involves instances where "the withheld evidence was highly relevant to and probative on the theory on which the case was decided").

Appellate Case: 19-2432    Page: 61    Date Filed: 09/06/2019 Entry ID: 4827942

1078 (2d Cir. 1972) (an attorney's "loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court."); *In re Intermagnetics America, Inc.,* 926 F.2d 912, 916 (9th Cir. 1991) ("fraud upon the court includes both attempts to subvert the integrity of the court and fraud by an officer of the court").

Finally, what distinguishes Mr. Lee's case from the mine-run cases on which the district court relied where plaintiffs fail to establish fraud on the court under Rule 60(d)(3)[31] is the sheer breadth and depth of the Government's misconduct here. Mr. Lee's case does not involve a "one-off" failure to comply with a discovery request. Rather, the Government engaged in a sustained campaign to hide information over a number of years. It omitted exculpatory evidence from official government reports; instructed a witness to avoid disclosing information while on the stand; allowed substantially misleading testimony to stand uncorrected; manipulated grand jury testimony to erase facts unfavorable to the prosecution; and repeatedly made fraudulent representations about its compliance with its *Brady* obligations during the pretrial, trial, and post-conviction proceedings, thereby short-circuiting judicial review of its pattern of misconduct. On these facts, Mr. Lee properly established fraud on the court pursuant to Rule

---

[31] *See* Doc. No. 1313 at 19-20 (citing cases)

59

Appellate Case: 19-2432    Page: 62    Date Filed: 09/06/2019 Entry ID: 4827942

60(d)(3). At the very least, he has met the requisite standard to establish that the district court's resolution of his Rule 60(d)(3) motion is debatable by jurists of reason and therefore a COA should issue.

## CONCLUSION

For the foregoing reasons, Mr. Lee respectfully requests that this Court summarily grant a COA on those issues which the district court did not resolve and remand for further proceedings. In the alternative, Mr. Lee requests that this Court grant a COA on the issues raised herein and set a schedule for merits briefing of these claims.

Respectfully submitted,

/s/ Morris H. Moon
Morris H. Moon
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

/s/ George G. Kouros
George G. Kouros
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lewis Lee

60

# CERTIFICATE OF SERVICE

This will certify that, on today's date, September 6, 2019, Appellant's counsel served this motion upon the United States by filing the document via this Court's ECF system.

/s/ George G. Kouros
George G. Kouros
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lewis Lee

Appellate Case: 19-2432    Page: 64    Date Filed: 09/06/2019 Entry ID: 4827942

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

No. 19-2432

_____

**DANIEL LEWIS LEE**,
Appellant,

v.

**UNITED STATES**,
Appellee.

_____

On Appeal from the United States District Court
Eastern District of Arkansas
No. 4:18-CV-00649-JLH; 4:97-cr-00243-KGB-2

_____

**APPENDIX OF EXHIBITS TO
APPLICATION FOR CERTIFICATE OF APPEALABILITY**
_____

MORRIS H. MOON
Bar# 24032750 (TX)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(713) 880-3556
Morris_Moon@fd.org

GEORGE G. KOUROS
Bar # 420813 (CT)
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Appellant Daniel Lewis Lee

# Table of Contents

Declaration of James Wanker………………………………………………………….A1

Declaration of Jack T. Lassiter…………………………………………………....A4

Serological Research Institute Mitochondrial DNA Report……………………...A6

"But Here's A Dissenting Opinion," The Courier News (Russellville, AR),
　　May 6, 1999…………………………………………………………A10

GPS coordinates of Mueller crime scene locations…………………………..A11

FBI 302 report re: driving times between crime scene locations……………….A12

Order in *Carter v. Kelley*, No. 5:16-cv-367-DPM-PSH (E.D. Ark. 4/25/17)…...A14

Canadian County Juvenile Court Report[1]…………………………...………..A16

---

[1] In compliance with the privacy policies of the Judicial Conference of the United States and in order to address privacy concerns articulated in Local Rule 25A(i), this document has been redacted to remove sensitive information.

Appellate Case: 19-2432    Page: 66    Date Filed: 09/06/2019 Entry ID: 4827942

1. My name is James Wanker. I currently reside in Spokane, Washington where I have lived most of my life.

2. In 1999, I was a witness for the Government at the murder trial of Danny Lee and Chevie Kehoe. At trial, the Government asked me about comments that Danny Lee made to me indicating that he had been involved with Chevie Kehoe in the murders in Arkansas.

3. I am providing this declaration to explain the context of those statements, what I thought about the statements, and all of the information I passed on to law enforcement and the prosecutors. I have recently had the opportunity to review my trial testimony, my grand jury statement, and the reports about my conversations with law enforcement and I was very surprised that the reports did not include all of what I said.

4. In May of 1996, my wife and I moved to the RV park at the Shadows Motel. In September of that year, I became the manager of the Shadows Motel. The Kehoe family and Danny Lee were living at the Shadows when we moved there and I also had contact with them as manager of the property.

5. The Kehoes were very secretive and stuck closely together. Danny Lee was somewhat reserved but he was friendlier than the Kehoes. It really seemed like he was just looking for somewhere to belong. He wanted to look badass like the Kehoes but you could tell he didn't really fit in with them.

6. Danny was a follower who tried to sound like a big guy. He was always trying to blow smoke up my ass; trying to impress me by sounding tough. He would spout off about different fights and crazy situations that were not true just to look tough and try to fit in.

7. When Danny made these comments about this trip, I didn't believe him. I knew him to be a braggart and that he would try to claim responsibility for criminal actions in order to fit in with the Kehoes. It still cracks me up that Danny was trying to be a tough guy.

8. In the spring of 1997, an officer from the Spokane Sheriff's office just happened by the Shadows Motel sometime after we had heard about the Kehoes' Ohio shootout. While we were chatting I mentioned what Danny had said to me. I told the officer that I didn't believe Danny's claims. At some point, I told ATF agent Sprenger about it too but he also didn't pay it any attention.

9. In the summer of 1997, law enforcement suddenly began to be interested. An officer in Arkansas called me on the phone to ask me questions and I told them the story Danny had relayed to me. I also told him at the time that I did not believe what Danny had told me about his involvement in the murders in Arkansas.

10. In early July, Agent Sprenger visited and interviewed me and my wife, Delvine. I told him the whole story and again said that I did not believe what Danny had said. Agent Sprenger was very dismissive and it seemed like he didn't believe the story or us. He was abrupt and did not appear to take many notes. It seemed like he was not interested in talking to us but someone had sent him out to do the interview. It was clear to me that he didn't believe either Danny's story or us.

11. Prior to the trial I was in contact with other government officials including Agent Jordan and the prosecutor Stripling. When we discussed my testimony, I told each of them that I didn't believe that what Danny had told me was true. I was recently shown written reports of my interviews with the Arkansas officer and Agent Sprenger and I was surprised this information was not included in the reports.

12. Prior to trial, I was told to limit my testimony to only what was asked and not to give personal opinions. They made me feel like my testimony was very important and told me that I should just answer their questions and not go into other areas. I followed their instructions and

**A2**

answered just what they asked me without providing additional details. Even in my grand jury testimony, for example, what I heard about Sean Haines going to Arkansas with Chevie was left out.

13. During the trial, I testified that the reason I hadn't called the police when I first heard Danny make those comments was because I thought he was just talking to hear himself talk. If anyone had asked me, I would have told them that I'd never changed my opinion about that, and that even at the time of trial I still didn't believe that Danny's story was anything more than just empty bragging.

14. When the Kehoes left the Shadows they just left Danny Lee behind. It was like he was dead weight. I got the sense they didn't think he was important enough to go with them. He was like a throw-away.

I declare pursuant to 18 U.S.C. §1746 that the foregoing is true and correct.

Dated: September 11, 2017.

James Wanker

## DECLARATION OF JACK T. LASSITER

1. My name is Jack T. Lassiter. I am an attorney in Little Rock, Arkansas. I have been licensed to practice law in Arkansas since 1975. My practice has largely focused on criminal defense. I am currently a partner at Lassiter & Cassinelli in Little Rock.

2. In December 1997, Cathleen V. Compton and I were appointed to represent Daniel Lee in his federal capital trial in the Eastern District of Arkansas. At that time I was working at the firm of Hatfield & Lassiter.

3. I was lead counsel for the guilt phase proceedings of the trial. Ms. Compton was lead counsel for the penalty phase proceedings.

4. The guilt phase proceedings commenced on March 8, 1999.

5. I did not have an opportunity to try and interview James Wanker before he testified because the government did not reveal his identity until just before he testified, probably the day before. I was responsible for preparing and conducting his cross-examination.

6. Mr. Wanker testified that he had heard Mr. Lee make an inculpatory statement. The prosecution relied on this statement in its arguments to the jury to return a guilty verdict against my client.

7. I've recently been informed that Mr. Wanker had told authorities on several occasions prior to the trial that Mr. Lee's statement was not credible because he knew Mr. Lee to be a braggart who frequently made up stories about being involved in crimes in order to impress others and to try to fit in by appearing tough. I was informed that Mr. Wanker maintained this view of the statement made by Danny Lee even after his arrest and at the time Mr. Wanker testified.

8. I have no recollection of the government informing us that Mr. Wanker had reason to disbelieve and did disbelieve Mr. Lee's statement, nor do I recall the government ever giving us any information about why Mr. Wanker thought Mr. Lee's statement was not credible. I am confident I did not have any such information because there is no reference to it in my cross-examination.

9. I would certainly have wanted to have known about this information because it indicated that the underlying statement was not trustworthy or reliable. If this information had been disclosed to me, I would have moved to exclude the statement under the Federal Rules of Evidence.

10. If the government had disclosed this information, and I had not succeeded in excluding the statement, I would have used it in my cross-examination of Mr. Wanker. It would have been important to inform the jury that Mr. Wanker had warned authorities that Mr. Lee's statement was not credible and that this warning was based on his knowledge of

Appellate Case: 19-2432    Page: 70    Date Filed: 09/06/2019 Entry ID: 4827942

Mr. Lee, on his observations at the time the statement was made, and on his experience that Mr. Lee would "brag" about things he had not in fact done.

11. It was important for us to impeach Mr. Wanker's testimony. During my cross-examination, I attempted to do so by noting that he had not called the police after hearing Mr. Lee's statement. Mr. Wanker explained that at the time he blew it off as just talk. While this still allowed the jury to believe he had changed his mind, I did not dare ask him anything further about this, such as whether he still thought it was just talk, without knowing in advance what his answer would be. Indeed, in the absence of any information to the contrary, the very fact that the government brought him all the way from Spokane and put him on the stand to testify against Mr. Lee suggested to me that he would not have given me a favorable answer.

12. If I had known the information that the government failed to disclose, I would have cross-examined Mr. Wanker aggressively and elicited all the information he had given to authorities for why the inculpatory statement was not credible. I would also have been able to demonstrate to the jury that even at the time of the trial, Mr. Wanker continued to maintain that the statement was just empty bragging and not trustworthy, and would have argued that the jury should therefore also not see it as a true remark.

13. I remember that at the penalty phase proceeding, the government presented evidence concerning Mr. Lee's alleged role in the murder of Joseph Wavra in Oklahoma in 1990. The government argued that even though the facts of the crime established that Mr. Lee was involved in the murder itself, he "got off" with a plea to robbery because the prosecutors decided to voluntarily drop the murder charge and give Mr. Lee, who was a juvenile at the time, a break.

14. I have recently learned that this is not what occurred. I was informed that Mr. Lee's murder charge was dismissed after it was determined there was insufficient evidence to support the charge. The government never gave us this information.

15. This information would have been favorable to Mr. Lee's penalty phase defense. Had it been disclosed, we would have certainly used it at trial to rebut the government's claim that Mr. Lee was guilty of a prior murder and that the prosecution had let him "get away with" just a plea to robbery.

I declare pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: 9-7-18

Jack T. Lassiter



June 8, 2007

David A. Ruhnke  
Ruhnke & Barrett, Attorneys at Law  
47 Park Street  
Montclair, NJ 07042

SERI Case No. M'7094'06  
Agency Case No. 4:97-CR-00243(02)  
GTE  
Suspect: Daniel Lewis Lee

### ANALYTICAL REPORT

On October 31st 2006, two items of evidence were received at the Serological Research Institute (SERI) from Glen Jordan from the Bureau of ATF, via FedEx #798031584151. Mitochondrial DNA analysis utilizing the Polymerase Chain Reaction (PCR) method was requested.

### ITEM 1   KNOWN HAIRS DANNY GRAHAM (Exh. 535)

This item consisted of a folded piece of paper containing two brown hairs (~1-2cm long) with no roots, and two white hairs (~2-3 cm long) with root sheaths. The hairs were examined microscopically. One entire white hair was sampled, washed, and extracted. The DNA extract was amplified by PCR using mitochondrial primers, and then subsequently sequenced. The results are tabulated below.

### ITEM 2   HAIR – BASEBALL CAP (Exh. 1037)

This item consisted of a slide containing one brown hair, approximately 11mm long, with no root. The entire hair was examined microscopically, sampled, washed, and extracted. The DNA extract was amplified by PCR using mitochondrial primers, and then subsequently sequenced. The results are tabulated below.

Appellate Case: 19-2432    Page: 72    Date Filed: 09/06/2019 Entry ID: 4827942

## TABLE OF RESULTS

| Item # | Description | HVI / CRS | 16291 | 16298 | 16311 | | HVII / CRS | 72 | 263 | 309.1 | 315.1 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CRS | C | T | T | | CRS | T | A | : | : | |
| 1 | Known Hair Danny Graham #535 | | T | | | | | | | G | C | C | |
| B/C | Extraction Blank | | No activity | | | | | No activity | | | | |
| 2 | Hair – Baseball Cap #1037 | | | C | C | | | C | G | C | C | |
| B/C | Extraction Blank | | No activity | | | | | No activity | | | | |

Hypervariable Region 1 (HVI) includes base positions 16018-16374.      Hypervariable Region 2 (HVII) includes base positions 71-365.

Legend
CRS=CAMBRIDGE REFERENCE SEQUENCE PUBLISHED BY ANDERSON ET.AL.
: =INSERTION (NO NUCLEOTIDE PRESENT IN THIS POSITION IN THE CRS)
BLANK=NUCLEOTIDE IS THE SAME AS CRS AT THIS POSITION

Appellate Case: 19-2432     Page: 73     Date Filed: 09/06/2019 Entry ID: 4827942

## EXPLANATION

Human DNA consists of a number of genetic marker systems. Nuclear DNA is found in the nucleus of the cell, and is inherited from both the mother and father. Analysis methods utilizing nuclear DNA rely on identifying small specific sections or repetitive sections of DNA wherein there are recognizable differences between people. Alternatively, analysis of mitochondrial DNA relies on determining the specific order or sequence of the thousands of individual nucleotide bases that serve as the building blocks of a person's mitochondrial DNA. Unlike nuclear DNA, mitochondrial DNA is located in the mitochondria of the cell, and is inherited maternally. In other words, both males and females have mitochondrial DNA, but only females can pass it on to their offspring. The mitochondrial genome is passed on in its entirety; therefore every individual in the same maternal lineage should have the identical mitochondrial DNA sequence.

When an organic extraction is performed on a biological sample, all genomic DNA will be extracted, including both nuclear and mitochondrial DNA. Therefore, DNA used for mitochondrial sequencing analysis can be extracted using the same procedures as those intended for nuclear DNA.

Thousands of copies of mitochondrial DNA are present in each cell, making mitochondrial DNA analysis possible from samples which are highly degraded or have very limited quantities of DNA. Samples such as skeletal remains, teeth and hair shafts frequently yield mitochondrial DNA results when nuclear DNA analysis is not possible.

The part of the mitochondrial genome significant to forensic science is known as the Control Region, and is made up of two hypervariable regions (HVI and HV2). The forensic community generally recognizes the HV1 and HV2 regions as consisting of base positions 16024-16365 and 73-340, respectively. An adenine (A), cytosine (C), guanine (G) or thymine (T) nucleotide is designated at every position, and base designations are numbered according to the Cambridge Reference Sequence, also referred to as the Anderson Sequence. Although the entire HV1 and HV2 regions are sequenced, only differences (polymorphisms) from the Anderson Sequence are noted when reporting a sample's mitochondrial DNA type.

Because the amplification of mitochondrial DNA is so sensitive, an extraction blank control to which no DNA is added is extracted, amplified, and sequenced along with the evidence samples. As anticipated, the extraction blanks employed in this case yielded no amplified mitochondrial DNA or sequencing data.

**A8**

David A. Ruhnke
SERI Case No. M'7094'06
June 8, 2007
Page 4 of 4

## CONCLUSIONS

The mitochondrial DNA sequence data from the hair from the Baseball Cap (item 2) <u>differs</u> from that of the hair from Danny Graham at a number of base positions and is therefore <u>excluded</u> as originating from the same person or maternal lineage.

## EVIDENCE DISPOSITION

The remaining unconsumed submitted evidence will be returned to Glen Jordon at the Bureau of Alcohol, Tobacco and Firearms in Little Rock, Arkansas. Portions of submitted reference samples along with any unconsumed evidentiary extracts will be retained at SERI.

SEROLOGICAL RESEARCH INSTITUTE

Vee Garcillano
Forensic Serologist I

Brian Wraxall
Chief Forensic Serologist

SERI1\CaseFiles\M'7094'06\Rpt1

**A9**

Appellate Case: 19-2432    Page: 75    Date Filed: 09/06/2019 Entry ID: 4827942

# But here's a dissenting opinion



**On the other hand**

By Rick Fahr
*Courier city editor*

Covering a trial, it's easy for a journalist to think about which side he or she believes more. Knowing how the system works, journalists probably seldom believe everything they hear from law enforcement, and we certainly take what defense attorneys tell us with a grain of salt.

As the federal trial of two alleged white separatists began in Little Rock two months ago, the case against Chevie Kehoe of Colville, Wash., and Daniel Lee of Yukon, Okla., seemed cut and dried. The government accused the pair of killing a Tilly family, conspiring to set up a whites-only nation and committing a series of crimes — racketeering by definition — to advance their scheme.

After 10 weeks of testimony, a mostly black jury convicted Kehoe and Lee on all counts. They face a possible death penalty in sentencing.

As I sat in the jury box March 1, marshals marched Kehoe and Lee into the courtroom. I remembered the first time I saw a picture of Kehoe, with his bushy, scraggly beard and then on videotape with his brother, Cheyne, in a shootout with Ohio police. I thought back to the first time I saw Lee, with his barroom brawl-injured eye and menacing tattoo on his neck. I figured these ol' boys had surely done something wrong, and I didn't really doubt that they had done what the government said they had.

But a funny thing happened on the way to a verdict.

I came to the judicial table with a heavy skepticism for defense attorneys. That must come from watching them defend the lowest scum on the pond of life. For example, attorneys represented Charles Manson, John Wayne Gacy, R. Gene Simmons. I suppose I've thought that if defense attorneys will defend those dregs, they'll defend any criminal. And guilt or innocence matters not. At least that's what I've felt from time to time.

So I've not run into many defenses that I believed, but Kehoe's and Lee's attorneys surprised me. By the time the jury got the case, Mark Hampton and Jack Lassiter had me thinking their clients may not have committed the crimes.

I thought the defense raised several credible issues.

■ The prosecution's star witnesses all benefitted from testifying. They either got reduced sentences or cash or both. Gloria Kehoe, for example, receives more than $20,000 a year from taxpayers. Kirby Kehoe, the patriarch of the clan and a heckuva nice fellow to boot, pleaded guilty to one charge in exchange for the government not indicting him for murder. Cheyne Kehoe testified against his brother for leniency as well.

■ The time frame that prosecutors said the Mueller murders occurred in does not neatly allow Chevie Kehoe and Lee enough time to get back to Spokane before witnesses placed them there. To do what prosecutors said they did, the pair would have had to drive 2,000 miles non-stop through the high altitudes of the West in the dead of winter.

■ Prosecutors said the defendants killed William Mueller inside his home, busting a shotgun stock on his head. Yet investigators found no physical evidence at the home. Not one single solitary hair or blood spot, even though the man "fought for his life." Prosecutors said Kehoe caved in the man's skull, although the defense said the state medical examiner did not find a recent skull fracture during his autopsy of William Mueller.

■ Authorities recovered the bodies in a remote, deep area of the bayou. The man who wound up with the title to a Mueller vehicle just days after prosecutors said the family disappeared, Paul Edward Humphrey, is an accomplished diver who knows the Illinois Bayou well. Chevie Kehoe is from Washington, and Lee is from Oklahoma. No testimony indicated they are divers or were familiar with the Illinois Bayou at all.

As I watched jurors sitting in the jury box last week, I thought back to how I believed early on that prosecutors would wrap up the case with a nice big bow on top, and jurors would take less time to convict the defendants than the judge did in reading jury instructions. Then, I thought about how I would vote were I sitting in that jury box again.

Could I convict Chevie Kehoe and Daniel Lee of capital murder? No, I couldn't.

Appellate Case: 19-2432    Page: 76    Date Filed: 09/06/2019 Entry ID: 4827942

183C-LR-38261
JES:jes
(2)

On 10/24/97, [                    ] Pope County Sheriff's
Office, Russellville, Arkansas, provided the following longitude
and latitude coordinates for significant activity relative to the
Mueller burglary and murders:

1.   Weekend of 2/12/95 - Mueller residence burglary.
1/11/96 - Mueller homicides.  Location 1 and 1/2 miles west of
Tilly, Searcy County, Arkansas.

North 35 degrees, 43 minutes, 42.5 seconds
West 092 degrees, 50 minutes, 22.6 seconds

2.   1/11-13/96 (discovered on 1/13/96) - Mueller White Jeep
Cherokee and trailer observed abandoned on Old Highway 7, Pope
County, Arkansas.

North 35 degrees, 32 minutes, 19.7 seconds
West 093 degrees, 05 minutes, 54.1 seconds

3.   1/11-12/96 ( discovered 6/28/96) - Mueller bodies dump
site in Arkansas bayou in North Russellville, Pope County,
Arkansas.

North 35 degrees, 19 minutes, 16.3 seconds
West 093 degrees, 08 minutes, 51.5 seconds

b6
b7C

183C - LL - 38.../ -53

W/TEXT ✓  W/O TEXT ____    Searched _____
LEADS SET _____    Serialized _____
                          Indexed _____
BY _____ DATE _____   Filed _____

FD-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    06/25/1998

On June 17, 1998, a videotape recording was conducted of three crime scenes and the travel route between the crime scenes relative to the investigation into the triple homicides of the MUELLER family in 1996. Present were RON EVANS and RICARDO VILLANUEVA, of the Special Photographic Unit, FBI Headquarters, Washington, D. C., NOLAND MC COY, photographer, AARON DUVALL, Investigator, Pope County Sheriff's Office, and SA JAMES E. SCHANANDORE.

The video tape recording began at the MUELLER residence in Tilly, Searcy County, Arkansas. The recording continued as the group traveled approximately 45 miles to the location where the MUELLERS' Jeep Cherokee was found abandoned. The recording continued as the group proceeded an additional 19 miles to the bridge of the Illinois bayou where the remains of the MUELLERS were recovered.

Photographs were also taken at the three crime scenes described above.

The following log outlines the videotaping activities:

| | |
|---|---|
| 10:25 a.m. | Arrived at MUELLER residence, HC 33, SR 16, Tilly, Searcy Co., Arkansas. |
| 1:05 p.m. | Departed MUELLER residence in a westerly direction on Highway 16, mileage - 0 |
| 1:12 p.m. | Arrived at Witts Springs, Searcy County, Arkansas, mileage - 4.5 |
| 1:45 p.m. | 5-minute break on Highway 16 |
| 1:59 p.m. | Arrived at Pelsor, Pope County, Arkansas, intersection of Highway 16 and Highway 7, mileage - 29.5, proceeded south on Highway 7 |

Investigation on  06/17/1998  at  Pope County and Searcy County, Arkansas

File # 183C-LR-38261                               Date dictated  06/19/1998

by   SA JAMES E. SCHANANDORE/rab

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**A12**

Appellate Case: 19-2432    Page: 78    Date Filed: 09/06/2019 Entry ID: 4827942

183C-LR-38261

Continuation of FD-302 of _____ , On 06/17/1998 , Page ___2___

| | | |
|---|---|---|
| 2:19 p.m. | | Arrived where MUELLER Jeep Cherokee found abandoned, located in a wooded area approximately 75 yards south of Old Highway 7 (Forest Road, 1801) mileage 45.5 |
| 2:54 p.m. | | Departed location where Jeep Cherokee abandoned and proceeded south on Highway 7 |
| 3:08 p.m. | | Arrived at Dover, Arkansas, mileage 57.5 |
| 3:17 p.m. | | Arrived at intersection of Highway 7 and Pleasant View Road, Russellville, Arkansas, mileage - 63.4 |
| 3:19 p.m. | | Arrived at bridge over the Illinois bayou where the remains of the MUELLERS were recovered mileage - 64.1 |

**A13**

Appellate Case: 19-2432     Page: 79     Date Filed: 09/06/2019 Entry ID: 4827942

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

SANDERS M. CARTER
ADC #88350                                                    PETITIONER

v.                          No. 5:16-cv-367-DPM-PSH

WENDY KELLEY, Director,
Arkansas Department of Correction                             RESPONDENT

ORDER

On *de novo* review, the Court declines the recommendation, № 12,

without prejudice. FED. R. CIV. P. 72(b)(3). The Magistrate Judge is right:

"second or successive" is a term of art. In the *Brady* context, though,

materiality is the touchstone. If Carter's *Brady* claim is nonmaterial, then he'll

have to get preauthorization to file his petition. *Crawford v. Minnesota*, 698

F.3d 1086, 1089–90 (8th Cir. 2012). But if his *Brady* claim is material, then his

petition may not be "second or successive" within the meaning of AEDPA.

*Ibid.; see also United States v. Lopez*, 577 F.3d 1053, 1066–67 (9th Cir. 2009).

On the current record, the Court can't determine whether Carter's *Brady*

claim is material and, thus, whether his petition requires preauthorization.

The Court therefore declines the recommendation, № 12, without prejudice;

**A14**

Appellate Case: 19-2432    Page: 80    Date Filed: 09/06/2019 Entry ID: 4827942

denies Kelley's motion to dismiss, № 8, without prejudice; and returns this

case to the Magistrate Judge for further proceedings.

So Ordered.

_____
D. P. Marshall Jr.
United States District Judge

_25 April 2017_

**A15**

Appellate Case: 19-2432   Page: 81   Date Filed: 09/06/2019 Entry ID: 4827942

REPORT TO THE COURT

Name of Child:  C█████ "Danny" G█████    Court Date:  05-03-90
DOB:  ████73                              ADJ:  Del./INT
Court N.:  JF 89-73                       Counselor:  Teddi Goodwin
DHS #:  CR 180247                                    Canadain Co.

FILED

MAY - 4 1990

CLYDE GENE MILLER
COURT CLERK, Canadian County
BP _____ Deputy

COURT INVOLVEMENT:

[redacted]

Danny's progress has been minimal.  He does well and then regresses.  He
is diliberately sabotaging his treatment by claiming to have participated
in very violent activities during leaves.  This far these "confessions"
have been proven to be bogus, but the very nature of the offenses is dis-
turbing.  In this counselor's opinion, Danny is far from being ready to
come back home.  [redacted]  He has not been working on his treatment
program.

RECOMMENDATION:

1-  Continued DHS custody
2-  Continue placement of COJTC.
3-  6 month Review.

Teddi Twyford Goodwin, SW II, CRCS

Terry Smith, SSS I, CRCS
Canadian County

Appellate Case: 19-2432     Page: 82     Date Filed: 09/06/2019  Entry ID: 4827942